730 So.2d 708 (1998)
Kayren P. JOST, as Plenary Guardian of Arthur Myers, Appellant,
v.
Amir AHMAD, M.D.; Amir Ahmad, M.D., P.A.; and Lakeland Regional Medical Center, Inc., Appellees.
No. 97-01731.
District Court of Appeal of Florida, Second District.
December 9, 1998.
Rehearing Denied April 19, 1999.
Wesley A. Fink of Fink and Sweet, Daytona Beach, and W.C. Gentry and Corinne C. Hodak of Gentry, Phillips & Hodak, P.A., Jacksonville, for Appellant.
Philip D. Parrish of Stephens, Lynn, Klein & McNichols, P.A., Miami, and Ronald H. Josepher of Josepher, Blazicek & Batteese, P.A., Tampa, for Appellees Amir Ahmad, M.D., and Amir Ahmad, M.D., P.A.
Thomas M. Hoeler, William E. Hahn, and Roland J. Lamb of Shear, Newman, Hahn & Rosenkranz, P.A., Tampa, for Appellee Lakeland Regional Medical Center, Inc.
PATTERSON, Judge.
In this medical malpractice action, Karen Jost, guardian of Arthur Myers, appeals from a final judgment in favor of the appellees, entered after an adverse jury verdict. We reverse because of an improper communication between a representative of the appellees and a critical plaintiffs witness.
On February 9, 1994, Myers, who had been suffering from flu-like symptoms, visited his general physician, appellee Amir Ahmad, M.D. Dr. Ahmad had been treating Myers for hypertension and found his blood pressure to be within normal limits. At 5:30 p.m. that day, Myers went to the emergency room of appellee Lakeland Regional Medical Center (LRMC) with "shock-like" symptoms. He remained in the emergency room and was admitted to the hospital. At 3:00 a.m. on February 10, he was moved to the intensive care unit (ICU). Blood cultures were taken which later showed that Myers had a Beta Strep Group A infection in his blood. As a *709 result of the blood test, Dr. Ahmad ordered antibiotics, which were administered at 10:30 p.m. The bacterial organism was effectively eradicated within the next two to three hours.
In her complaint, Jost alleged that, in the time between Myers' admission to the hospital and the administration of the antibiotics, Dr. Ahmad had been unresponsive to numerous calls from nurses regarding the apparent severity of Myers' condition. She alleged that Dr. Ahmad failed to make a timely diagnosis, had failed to institute immediate treatment, and failed to recognize and treat symptoms of impending sepsis, all of which contributed to the deterioration and severity of Myers' medical condition.
Jost further alleged that on February 11, when Myers was near cardiopulmonary collapse, Dr. Ahmad attempted to insert an invasive monitoring device, called a Swan-Ganz Catheter, into Myers' jugular and subclavian vein. After several attempts to perform this procedure, Dr. Ahmad punctured Myers' lung, causing respiratory arrest and ensuing coma. During the course of these events, a nurse called in Dr. Walter Gray, a specialist in intensive care medicine, who properly inserted the catheter. Dr. Gray thereafter took over Myers' treatment until Myers' eventual discharge from the hospital. At that time, Myers had suffered permanent brain damage, accompanied by severe physical limitations. Jost alleged that these conditions were the result of the negligence of Dr. Ahmad and LRMC.
In a pretrial hearing, the court ruled that Dr. Gray, as Myers' treating physician, would not be permitted or required to give an expert opinion of the standard of care Dr. Ahmad and LRMC rendered to Myers. He was nonetheless a critical fact witness in Jost's case.
The case proceeded to trial. Dr. Gray was called as a witness for Jost. During a bench conference with the jury excused, Dr. Gray volunteered from the witness stand to the court and counsel:
DR. GRAY: Somebody from the hospital called my risk management office this morning and passed along instructions for me from my risk management office.
THE COURT: We are not going to have any threats on the witnesses.
MR. LAMB: Your Honor, I don't know anything about this.
MR. HAHN: What kind of threat?
THE COURT: To remind him of any collateral damage in this case while he's testifying.[1]
An exchange then occurred between the court and counsel wherein the court instructed defense counsel to look into the matter and to instruct the "hospital people" not to put pressure on the witnesses. Jost's counsel requested that the persons responsible be brought before the court and questioned. The court then recessed for lunch.
When court reconvened, defense counsel advised the court that the insurance carrier, not the hospital itself, had contacted Dr. Chapman, Dr. Gray's risk management officer at the Watson Clinic. Dr. Gray disagreed, saying, "It's not the flavor that I got. I actually called Dr. Chapman myself. He says that a Michael Meyer had called him at the direction of Bill Hahn."[2] Defense counsel then suggested that Dr. Chapman be brought before the court. The court appeared to agree, then did nothing to compel Dr. Chapman's appearance. Mr. Hahn disclaimed any involvement in the incident. The following exchange then occurred between Dr. Gray and Jost's counsel:
MR. GENTRY: You said you made a phone call to Dr. Chapman?
DR. GRAY: Dr. Chapman called me this morning while I was on the way to Bartow. He told me
MR. GENTRY: Did you have a conversation with him?
DR. GRAY:that a representative from the hospital, at that time I didn't know *710 who, had called to remind me that my testimony was to limit collateral damage.
The court then indicated an intent to summon Dr. Chapman, but did not, and said, "We'll get to the bottom of it later." At the conclusion of Dr. Gray's testimony, Jost's counsel requested permission to question Dr. Gray in regard to the communication in the presence of the jury, which request was denied.
Later in the trial, Jost's counsel brought the matter again to the court's attention, requesting that Dr. Chapman be required to appear. The court responded, "As I indicated to you, this is a matter for the Court. The Court has undertaken to make further investigation in this matter.... I do not believe that it involves the attorneys.... And if it gets to that point, I will involve you in this." Having foreclosed Jost's counsel from proceeding on the matter, the court apparently did nothing further to resolve it.
In her motion for new trial, Jost argued:
1. the court erred in prohibiting her counsel from inquiring of Dr. Gray about the communication;
2. the court erred in failing to allow her counsel to examine Dr. Chapman or Michael Meyer; and
3. the court erred in failing to follow through with its announced intention to investigate the matter.
The trial court denied the motion.
We are confronted with a record which is lacking in detail as to this incident, primarily because the trial court prohibited counsel from making an adequate inquiry. Therefore, we base our conclusions on the limited record and the reasonable inferences that may be drawn from it. The record does reflect that the communication came to Dr. Gray after he had been placed under oath and from a person, Dr. Chapman, who is not a party to the action. Dr. Chapman's source of information was LRMC's insurance carrier. In our view, LRMC's insurance carrier, the entity which will pay all or a substantial part of any verdict rendered against LRMC, is an interested party in this litigation. A communication from it is akin to a communication from LRMC itself. This was not a communication from a third party with no direct interest in the outcome of the case.
This situation can be categorized generally as "witness tampering." The issue presented is whether Jost should have been permitted to question Dr. Gray regarding the communication in the jury's presence. The threshold question is whether the matter is relevant. That determination turns on the meaning of the communication as it could be reasonably understood by Dr. Gray. The communication was to remind Dr. Gray that his testimony "was to limit collateral damage." The meaning of the term "collateral damage" is not part of the record and is not crystal clear on its face. We interpret it, however, to relate to damages for which LRMC could be held liable for Dr. Ahmad's negligence. Therefore, the communication is relevant. Although Dr. Gray is categorized as a "fact witness" prohibited to give an expert opinion of the standard of care provided by Dr. Ahmad, a reading of his testimony reveals that it is replete with medical opinions as to Myers' condition at the time Dr. Gray entered the picture and the possible causation for that condition. These assessments and opinions, although not expressed in terms of "standard of care," relate directly to that subject. We note that nothing in Dr. Gray's testimony indicates any negligence or lack of proper skills or procedures on the part of Dr. Ahmad. If our definition of "collateral damage" is correct, Dr. Gray's testimony could be viewed as "limiting" that type of damage. The jury should have been made aware of the possibility that his testimony could have been influenced by the communication in question.
We are aware of no civil case in this state which addresses this situation. However, our conclusion finds support in criminal law. See Koon v. State, 513 So.2d 1253, 1256 (Fla. 1987):
The fact that a witness has been threatened with respect to his testimony may bear on his credibility regardless of who made the threat. Therefore, there was a legitimate basis for the admission of this testimony. *711 See also Coronado v. State, 654 So.2d 1267 (Fla. 2d DCA 1995); Knotts v. State, 533 So.2d 826 (Fla. 1st DCA 1988).
In the context of civil litigation, McCool v. Gehret, 657 A.2d 269 (Del. 1995), a medical malpractice case, is similar to this case. In McCool, the defendant, Dr. Gehret, approached Dr. Krell, a doctor on the same hospital medical staff as Dr. Dein, who was the McCools' medical expert. Dr. Gehret asked Dr. Krell to relay to Dr. Dein "the message that it was inappropriate for doctors to testify against doctors." Id. at 273. Dr. Krell reluctantly did so. Notwithstanding this communication, Dr. Dein testified on the McCools' behalf. The case resulted in a defense verdict for Dr. Gehret. In holding that it was reversible error for the trial court to have excluded this communication as evidence to be presented to the jury, the court stated:
This Court has held that "attempts to improperly influence a witness' testimony are fundamentally unfair and pervert the truth-seeking function." Weber v. State, Del.Supr., 457 A.2d 674, 679....
... it is precisely because of the egregious nature of such conduct that the law expressly permits the jury to make adverse inferences from a party's effort to intimidate witnesses or otherwise suppress probative evidence against him.
Id. at 276 (citing McCormick on Evidence § 265 (John W. Strong, et al. eds., 4th ed.1992)).
Thus, a party's efforts to interfere with a witness are not simply admissible as impeachment evidence of the tampering party's credibility. Meyer v. McDonnell, 392 A.2d at 1134. The opposing party is entitled to introduce facts regarding efforts to intimidate a witness as substantive evidence.

. . . .
... the McCools were absolutely entitled to introduce the evidence of Dr. Gehret's attempt to intimidate Dr. Dein as substantive evidence.
Id. at 277-78. See also Meyer v. McDonnell, 40 Md.App. 524, 392 A.2d 1129 (1978) (physician's attempted intimidation of expert witness in medical malpractice action had probative value insofar as it related to physician's consciousness of weakness of his case and was admissible for such purpose).
We agree with the rationale and the holding in McCool and determine that it was reversible error for the trial court to have excluded the communications made to Dr. Gray as substantive evidence to be presented to the jury. Therefore, we reverse and remand for a new trial.
Because this case must be retried, we will address Jost's argument that the trial court erred in failing to give the standard jury instruction on "aggravation of a pre-existing condition." Based on the record facts, we agree that the trial court should give the "aggravation" instruction in conjunction with the "concurrent cause" instruction if requested by any party. We do not address the remaining points on appeal.
Reversed and remanded for new trial.
PARKER, C.J., and THREADGILL, J., concur.
NOTES
[1] The record is silent as to what prompted this conclusion on the part of the judge.
[2] Michael Meyer is the insurance claims adjuster responsible for this case on behalf of the hospital's carrier. Mr. Hahn is one of the attorneys representing LRMC.