LABARGA, C.J.
This case is before the Court for review of the decision of the Fourth District Court of Appeal in Special v. Baux, M.D., et al., 79 So.3d 755 (Fla. 4th DCA 2011). In its decision, the district court ruled upon the following question, which the court certified to be of great public importance:
IN A CIVIL APPEAL, SHALL ERROR BE HELD HARMLESS WHERE IT IS MORE LIKELY THAN NOT THAT THE ERROR DID NOT CONTRIBUTE TO THE JUDGMENT?
Id. at 771-72. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. As we explain below, we answer the certified question in the negative. We hold that the test for harmless error requires the beneficiary of the error to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error complained of contributed to the verdict. We begin by setting forth the facts and the procedural history of this case, and we then turn to our discussion of the proper harmless error test in civil appeals. We conclude with our discussion of the harmless error test as applied, to the facts of this case. Because there is a reasonable possibility that certain errors by the trial court contributed to the verdict, we reverse the judgment of the district court and remand for a new trial.
In order to avoid any possible confusion stemming from our multiple opinions, we further explain that a majority of this Court (Chief Justice Labarga and Justices Lewis, Quince, and Perry) concur as to the harmless error standard that we announce today. Moreover, a majority of this Court (Chief Justice Labarga and Justices Par-iente, Lewis, Quince, and Perry) concur that Petitioner, Frank Special, is entitled to a new trial. While the separate opinions reach different conclusions about the three instances of harmless error argued as grounds for a new trial, as explained more fully below, the plurality opinion grants a new trial based on two harmful errors (the exclusion of testimony relating to the over-diagnosis of amniotic fluid em-bolus (AFE) and the exclusion of testimony regarding statements made to the medical examiner through her attorney).
FACTS AND PROCEDURAL HISTORY
In 2003, Susan Special (Susan) died following the delivery of her son. Frank Special (Special), as the personal representative of his wife Susan’s estate, sued Dr. Ivo Baux and his related corporations (Baux), and West Boca Medical Center, Inc. (West Boca), for negligence. The *1254 Fourth District detailed the following events concerning the birth:
Susan Special became pregnant at age 38. Five weeks before her due date, [Susan] underwent a cesarean delivery. She was wheeled into the operating room at the Center’s labor and delivery suite. Dr. Baux, the anesthesiologist, administered spinal anesthesia. A moment after the placenta was removed, Susan became unresponsive, her blood pressure fell precipitately, and she went into cardiopulmonary arrest. Dr. Baux and hospital staff attempted to revive her. She was temporarily resuscitated and transferred to the Intensive Care Unit, where another cardiopulmonary arrest occurred. Susan died five hours after the delivery.
Id. at 757.
Following Susan’s death, Special filed a lawsuit against defendants Baux and West Boca, which alleged that the defendants’ negligence caused Susan’s death. The lawsuit proceeded to trial, at which the cause of Susan’s death was the central issue. Special alleged that Baux and West Boca “were negligent in administering anesthesia, in monitoring [Susan’s] system and controlling her fluids during surgery, and in responding to her cardiopulmonary arrests.” Id. Baux and West Boca defended against these claims and asserted that Susan’s death was caused by an amniotic fluid embolus (AFE), which is an allergic reaction that develops when a mother’s blood mixes with amniotic fluid.
The parties offered conflicting expert testimony concerning the cause of Susan’s death. Ultimately, the jury found that Baux and West Boca were not liable for Susan’s death, and the trial court entered judgment in favor of the defendants. Special appealed to the Fourth District Court of Appeal, which ultimately considered this case en banc in order “to reconsider other decisions of this court describing the harmless error test in civil cases.” Id. at 757. The district court held that “[t]o avoid a new trial, the beneficiary of the error in the trial court must show on appeal that it is more likely than not that the error did not influence the trier of fact and thereby contribute to the verdict.” Id. at 771. The district court then applied the “more likely than not” harmless error test to the facts of Special and concluded that it was more likely than not that the alleged errors did not contribute to the verdict. Id. at 772. Having concluded harmless error, the district court affirmed the trial court’s judgment in favor of Baux and West Boca.
However, the district court certified to this Court a question of great public importance for the purpose of determining the proper test for harmless error in civil appeals. This Court accepted jurisdiction in order to consider the certified question. In addition to the question certified by the district court, before this Court, Special argues specific instances of harmful error: (1) the exclusion of the proffered testimony of Dr. Gary Dildy, the defense AFE expert; and (2) the exclusion of evidence related to the alleged witness tampering of Dr. Barbara Wolf, the chief deputy medical examiner. We begin with our discussion of harmless error and the appropriate test for harmless error in civil appeals. We then evaluate the assertions of error in this case in light of the test that we announce today.
ANALYSIS
The Test for Harmless Error
The purpose of the harmless error analysis is to “conserve judicial labor by holding harmless those errors which, in the context of [a] case, do not vitiate the right to a fair trial and, thus, do not re *1255 quire a new trial.” State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Although the harmless error analysis serves a clear purpose, over time, the test for determining whether error is indeed harmless has been fluid. As we discuss below, this Court has previously set forth the test for harmless error in criminal appeals; however, the question certified by the district court calls upon this Court to announce the correct test for harmless error in civil appeals. Because the certified question presents a pure question of law, our standard of review is de novo. See Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So.3d 1076, 1085 (Fla.2008) (citing Macola v. Gov’t Emp. Ins. Co., 953 So.2d 451, 454 (Fla.2006)).
As we consider the proper test for determining harmless error in civil appeals, we are mindful of the harmless error rule contained in section 59.041, Florida Statutes (2003), which provides as follows:
Harmless error; effect. — No judgment shall be set aside or reversed, or new trial granted by any court of the state in any cause, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case it shall appear that the error complained of has resulted in a miscarriage of justice. This section shall be liberally construed.
§ 59.041, Fla. Stat. (2003).[1] Under this rule, appellate courts must evaluate harmless error on a case-by-case basis. Moreover, within the context of each case, in order to determine whether “the error complained of has resulted in a miscarriage of justice,” the court’s analysis must include an examination of the entire record. What remains, however, with respect to civil appeals, is an interpretation of the language “resulted in a miscarriage of justice” — i.e., the determination of a test for harmless error. Over time, a number of approaches to harmless error have evolved. This evolution has resulted in the application of a variety of tests to determine harmless error.
However, it is appropriate to begin our analysis of the proper test for harmless error in civil appeals with this Court’s decision in DiGuilio — a seminal decision in the line of cases interpreting harmless error in Florida, wherein this Court set forth the test for harmless error in criminal cases. In DiGuilio, the defendant was convicted of conspiracy to traffic in cocaine. 491 So.2d at 1130. On appeal, his conviction was reversed by the district court because the prosecutor improperly “elicited testimony from a witness which could be interpreted by the jury as a comment on [the defendant’s] right to remain silent.” Id. The district court certified a question of great public importance to this Court, asking this Court to determine whether comments on a defendant’s right to remain silent are subject to harmless error analysis, as opposed to a rule of per se reversal. Id. This Court answered the certified question in the affirmative and held that while comments on a defendant’s right to remain silent amount to constitutional error, such comments “are subject to harmless error analysis.... ” Id. at 1137.
Having held that the harmless error test applied to DiGuilio’s claim of error, this Court explained that in order to *1256 demonstrate harmless error, “the beneficiary of the error [has the burden] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” Id. at 1135, 1139 (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Thus, as opposed to a result-oriented test that is strictly focused on the accuracy of the result or the weight of the evidence, the DiGuilio harmless error test focuses on the effect of the error on both the trier-of-fact and the result. See Johnson v. State, 53 So.3d 1003, 1007 (Fla.2010) (emphasis added) (“The test for harmless error focuses on the effect of the error on the trier of fact.”); Burns v. State, 699 So.2d 646, 652 (Fla.1997) (noting that reversal is required if the error contributed to the jury’s recommendation or the error contributed to the outcome). To emphasize the appellate court’s duty.to focus on the effect of the error on the trier-of-fact, we explained that the harmless error test is not:
a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence.
DiGuilio, 491 So.2d at 1139. Moreover, a determination of whether an error is harmless should not be made in a vacuum. Rather, the
[application of [this] test requires an examination of the entire récord by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.
Id. at 1135. Thus, the appellate court must remain focused on the error itself in order to evaluate whether the beneficiary of the error has proven that there is no reasonable possibility that the error contributed to the verdict.
The Test for Harmless Error in Civil Appeals
Although the test for harmless error as stated in DiGuilio applies to criminal appeals, we conclude that this test, with slight modification to accommodate the civil context, is also the appropriate test for harmless error in civil appeals. Thus, today, we announce the following test for determining harmless error in civil appeals:
To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict.
Thus, as in DiGuilio, the responsibility for proving harmless error remains with the beneficiary of the error, who müst demonstrate that there is no reasonable possibility that the error contributed to the verdict. As the appellate court evaluates whether the beneficiary of the error has satisfied its burden, the court’s obligation is to focus on the effect of the error on the trier-of-fact and avoid engaging in an analysis that looks only to the result in order to determine harmless error. Could the admission of evidence that should have been excluded have contributed to the verdict? Could the exclusion of evidence that should have been admitted have contributed to the verdict? Unless the beneficiary of the error proves that there is no reason *1257 able possibility that the error contributed to the verdict, the error is harmful.
We observe that this test is consistent with the harmless error rule codified in section 59.041, and the Legislature’s, intent that relief be granted only in the event of “a miscarriage of justice.” An appellate court’s harmless error analysis is not limited to the result in a given case, but it necessarily concerns the process of arriving at that result. “A large word like. justice, incorporated into a rule governing harmless error, compels an appellate court to concern itself not alone with a particular result but also with the very integrity of the judicial process.” Roger J. Traynor, The Riddle of Harmless Error 17 (1970). By focusing on the effect of the error on the trier-of-fact, the appellate court will evaluate harmless error in a manner that is consistent with section 59.041.
Moreover, the application of the no reasonable possibility test for harmless error in civil appeals will serve multiple purposes. The test acts in a manner so as to conserve judicial resources while protecting the integrity of the process. Additionally, the test strikes the proper balance between the parties. While the party that seeks relief must still identify the error and raise the issue before the appellate court, this test properly places the burden of proving harmless error on the beneficiary of the error. Requiring the beneficiary of the error to demonstrate that there is no reasonable possibility that the error contributed to the verdict discourages efforts to introduce error into the proceedings. “Equity and logic demand that the burden of proving such an error harmless must be placed on the party who improperly introduced the evidence. [Placing] the burden of proof on the party against whom the evidence is used ... would simply encourage the introduction of improper evidence.” Gormley v. GTE Prod. Corp., 587 So.2d 455, 459 (Fla.1991).
The no reasonable possibility test also strikes the appropriate balance between the need for finality and the integrity of the judicial process. The test recognizes that not all errors have a reasonable possibility of contributing to the verdict, but the test affords .relief on account of errors that do. Further, the application of the no reasonable possibility test for harmless error will foster consistency in appellate courts’ analyses of harmless error. Having articulated the proper test for harmless error in civil appeals, we now apply the test to the facts of the present case.
Evaluation of Harmless Error in this Case
Special argues that the trial court committed harmful error when it excluded the proffered cross-examination of the defense AFE expert and when it excluded evidence related to two circumstances of alleged witness tampering. We discuss each of these arguments in turn. Consistent with the discussion that follows, we conclude that the exclusion of the cross-examination testimony and the exclusion of certain evidence of witness tampering were indeed harmful.

The Cross-Examination of Dr. Dildy

The cause of Susan’s death was the key issue at trial. Baux and West Boca defended themselves against Special’s allegations of negligence on the grounds that Susan died as the result of AFE. Special contested the AFE diagnosis and attempted to demonstrate that West Boca had a practice of over-diagnosing AFE. To that end, Special argues that the trial court erred when it precluded counsel from cross-examining Dr. Gary Dildy, the defense AFE expert, concerning whether West Boca was over-diagnosing AFE.
*1258 At trial, Dr. Dildy opined that Susan died of AFE. Dr. Dildy’s diagnosis was a diagnosis of exclusion, at which he arrived after ruling out other possible causes of death. On cross-examination, Dr. Dildy testified that approximately one in 20,000 births results in AFE, but the occurrence of AFE can range from one in 8,000 to one in 80,000 births. Special sought to further cross-examine Dr. Dildy with a line of questioning that was intended to undermine the credibility of the testimony of those who diagnosed Susan as having died from AFE — including the testimony of Dr. Mark Adelman, the West Boca pulmonologist who diagnosed Susan with AFE after the emergency began. Dr. Adelman testified that the national average for AFE diagnoses can range from approximately one in 30,000 births to one in 80,000 births, but he estimated that during the then-eighteen-year existence of the obstetrics department at West Boca, there were 20,-000 births and one to two AFE diagnoses per year. Special introduced an interrogatory response from West Boca that showed that contrary to Dr. Adelman’s estimate of 20,000 births per year, the average number of births per year at West Boca was about 2,200 births. Based on the national averages of AFE as testified to by Dr. Adelman and Dr. Dildy, Special sought to elicit an opinion from Dr. Dildy on whether AFE was being overdiagnosed at West Boca.
The defense objected to this line of questioning. After receiving argument from the parties, the trial court sustained the defense objection. However, the trial court allowed Special to proffer the cross-examination of Dr. Dildy. In relevant part, Special proffered the following:
SPECIAL: Dr. Dildy, if, in fact, there are one to two amniotic fluid emboluses diagnosed ... at West Boca Medical Center every year, and there are, in fact, 2,200 births per year ... what does that tell you about West Boca Medical Center?
DILDY: Well, under those assumptions, there’s about one per thousand, that would be higher than the generally quoted rates in the literature. On the one hand, over a short period of time, it’s certainly possible that things can occur in clusters. Over the long term, if there were strong data to suggest that amniotic fluid embolism were occurring at that rate over a period — over many years, then I would probably have to say that it’s being overdiagnosed.
SPECIAL: And, if, in fact, there’s evidence that over a 17- to 18-year period, it’s consistently one to two amniotic fluid emboluses per year, diagnosed by the critical care doctor, Dr. Adelman, and there are 2,200 births approximately per year, over that same period of time, do you believe the term “amniotic fluid embolism,” at West Boca Medical Center, is being overused?
DILDY: If they were at that rate over a long period of time, I suspect there’s many cases where you have presumed amniotic fluid embolism, but the pattern may not be — in fact, even in our study we had a number of presumed cases we excluded.... But, I would say certainly there’s no question, there are cases of abnormal outcomes and disease states that are labeled as amniotic fluid embolism, where other people would argue it’s not.
SPECIAL: If there is 1 in 2,000 births a year, that’s approximately ten times what you told us is a fair national average, correct?
DILDY: Either ten times or five times, depending upon how you do the math, right?
SPECIAL: The math that you gave us was, that you believe is a reasonable *1259 number, that 1 in 20,000 patients have AFE, correct?
DILDY: That’s one number I offered. It could be 1 in 8,000.
SPECIAL: It could be 1 in 80,000?
DILDY: It could be 1 in 80,000.
SPECIAL: So if there is one a year in West Boca Medical Center, that would be 1 in 2,000 as opposed to 1 in 20,000, that’s ten times the national average.
DILDY: That would be a higher rate, correct.
SPECIAL: If it’s 1 in 80,000, it would be 40 times the national average, right?
DILDY: Correct.
⅜ * *
SPECIAL: ... If there are two AFEs a year at West Boca Medical Center, and the national average is 1 in 80,000 say, okay, and there’s 2 per 2,000 at West Boca Medical Center, just doing the math, that would be 80 times the national average?
DILDY: Under those assumptions, right.
SPECIAL: Under those assumptions,' what would that tell you about AFE and West Boca Medical Center?
DILDY: I would be very concerned that if this is actually a recorded incidence, as opposed to somebody’s recollection. Because if you ask me, what’s the incidence of this or that, I could give you a number which is going to be a pretty ballpark number. If that’s a documented incidence, I would be concerned that the rate is probably inflated.
SPECIAL: And although you might be off here or there, you wouldn’t be off by 40, 80 times the national average, would you, at your hospital?
DILDY: It just depends on how the question is asked....
SPECIAL: If you’re asked how many you diagnose a year and you say one to two, it shouldn’t be off by 30, 40 times, should it?
DILDY: No, I would say in a place that does a little over 2,000 deliveries a year, you could easily have one or two a year per couple of years or here or there, but you wouldn’t expect to have one or two per year long term, no. But this case here, we’re talking about, it doesn’t matter what all these other cases are, this case is this case, and this case is an amniotic fluid embolism.
Following the proffer, the trial court restated its ruling that Special would not be allowed to cross-examine Dr. Dildy on the issue of over-diagnosis. On appeal, although the district court concluded that the trial court should have allowed the excluded testimony, the court also determined that the exclusion of Dr. Dildy’s testimony was harlnless error under the “more likely than not”- standard.
We agree with the district court that the trial court erred in excluding the testimony. The rules of evidence provided the trial court with no discretion to exclude the contested cross-examination. Section 90.403 of the Florida Statutes permits trial courts to exclude orily evidence in which the “probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.403, Fla. Stat. (2007). Florida courts do not have the authority to bar or limit adverse or relevant evidence such as Special attempted to present here. Because the trial court erred when it excluded Dr. Dildy’s testimony, we proceed to evaluate the error in light of the harmless error test we announce today. In doing so, we conclude that Baux and West Boca, as the beneficiaries of the error, have not demonstrated that there is no reasonable *1260 possibility that the exclusion of Dr. Dildy’s testimony contributed to the verdict.

Was the Exclusion of Dr. Dildy’s Testimony Harmless Error?

The essence of Special’s argument on this issue is as follows: the jury should have been allowed to hear Dr. Dildy’s opinion that if one to two out of 2,200 births each year at West Boca resulted in a diagnosis of AFE, West Boca was overdiagnos-ing AFE — thus drawing into question the credibility of the diagnosis of Susan. Special contends that the exclusion of this testimony was harmful error. We agree.
During the trial, Dr. Dildy reiterated his opinion that Susan died from AFE. Dr. Dildy also agreed that AFE was a diagnosis of exclusion, in other words, it is diagnosed only after other explanations are ruled out. As noted by the district court in this case, “[w]here the diagnosis is one of exclusion, the frequency with which one comes to that conclusion is a ‘material fact’ bearing upon the credibility of the diagnosis.” Special, 79 So.3d at 759 (footnote omitted). By precluding the jury from considering Dr. Dildy’s testimony with regard to the over-diagnosis of AFE, Special was prevented from presenting evidence to demonstrate and further support the argument that physicians at West Boca were over-diagnosing AFE. The inability to address this issue through Dr. Dildy during cross-examination hindered Special’s efforts to undermine the credibility and weight of Baux and West Boca’s defense with regard to the cause of Susan’s death as well as the credibility of Dr. Dildy, who held steadfast to the AFE diagnosis. See id. at 759-60 (“The cross-examination was also relevant to Dr. Dildy’s direct examination where he testified to the incidence of AFE in births and its rarity.” (emphasis supplied)).
We reject the Fourth District’s conclusion that the error was harmless because the excluded testimony was cumulative. The Fourth District stated:
This issue was presented to the jury through the testimony of Dr. Adelman and in part from Dr. Dildy. This evidence allowed the plaintiffs attorney in closing argument to hammer on the significance of the statistical abnormality.
Id. at 772. Because the battle of experts has become as much a part of a trial as the conflict that the litigation addresses, see Marsh v. Valyou, 977 So.2d 548, 548 (Fla.2007) (quoting Berry v. CSX Transp., Inc., 709 So.2d 552, 571 (Fla. 1st DCA 1998)); Emory v. Fla. Freedom Newspapers, 687 So.2d 846, 847 (Fla. 4th DCA 1997); Secada v. Weinstein, 563 So.2d 172, 172 (Fla. 3d DCA 1990); Langston v. King, 410 So.2d 179, 180 (Fla. 4th DCA 1982), Special’s inability to critically- address the issue of over-diagnosis with Dr. Dildy significantly handicapped his case. Also without merit is Baux and West Boca’s allegation that if the trial court erred in excluding this testimony, the error was harmless because Special was able to discuss this issue during closing argument. The commentary of counsel in closing is not evidence, nor may the jury consider the mere argument as evidence when it deliberates and renders a verdict. See Braddy v. State, 111 So.3d 810, 843 (Fla.2012) (“The trial court properly instructed the jury that statements [offered] during closing argument did not constitute evidence to be considered in determining [the defendant’s] guilt.”), cert. denied, — U.S. -, 134 S.Ct. 275, 187 L.Ed.2d 199 (2018). Barring an entire line of cross-examination of an expert witness concerning critical facts and opinions directly related to the core issue of a case necessitates recognition that the responses of the expert witness here would have yielded powerful impeachment evidence. Dr. Dil- *1261 djfs concession as to the inaccuracies and anomalies of Dr. Adelman’s AFE diagnoses would have reasonably had a significant effect on the jury’s deliberations and decisions, particularly with regard to the cause of Susan’s death.
Given the relevance and probative force of Dr. Dikiy's testimony, the exclusion of this cross-examination was in fact harmful. The jury should have been permitted to hear testimony on this factual issue and to weigh it against the statements and credibility of the testifying experts. To the extent that Baux and West Boca allege that Dr. Adelman’s numbers concerning the rate of AFE at the hospital were “grossly overestimated,” and thus should not serve as a basis for Special’s allegation of over-diagnosis, this was an issue for the jury to determine. There is more than a “reasonable possibility” that the trial court’s erroneous evidentiary ruling contributed to the verdict, and accordingly, a new trial is required. See DiGuilio, 491 So.2d at 1135. Having concluded that the exclusion of Dr. Dildy’s testimony was harmful error, we now turn to the exclusion of evidence of alleged witness tampering.

Witness Tampering

Special also argues that the trial court erred when it excluded evidence relating to the defense’s alleged witness tampering of Dr. Barbara Wolf, the deputy chief medical examiner who performed the autopsy on Susan. Dr. Wolf concluded that the autopsy revealed no evidence of AFE and opined to a reasonable degree of medical certainty that Susan did not die of AFE. A part of the autopsy included obtaining specimens that were used to create slides for microscopic examination in order to determine the presence of AFE.
According to Special, the defense attempted to intimidate Dr. Wolf because she did not agree that AFE was the cause of Susan’s death. At trial, Dr. Wolf testified that while the majority of AFE-related deaths yield evidence of AFE in the autopsy, the autopsy of Susan revealed no evidence of AFE. Although the district court did not address this issue in its opinion, “... once this Court has jurisdiction of a cause, it has jurisdiction to consider all issues appropriately raised in the appellate process, as though the case had originally come to this Court on appeal.” Savoie v. State, 422 So.2d 308, 312 (Fla.1982). Although “[t]his authority to consider issues other than those upon which jurisdiction is based is discretionary with this Court and should be exercised only when these other issues have been properly briefed and argued and are dispositive of the case,” we do so here because of the serious nature of witness tampering allegations. Id.
Florida courts permit evidence of threats or witness intimidation if the threats are attributable to the opposing party. See Koon v. State, 513 So.2d 1253, 1256 (Fla.1987) (“It has been held that evidence of threats made against witnesses is inadmissible to prove guilt unless the threats are shown to be attributable to the defendant.”) (citing Duke v. State, 106 Fla. 205, 142 So. 886 (1932); Jones v. State, 385 So.2d 1042 (Fla. 1st DCA 1980); Coleman v. State, 335 So.2d 364 (Fla. 4th DCA 1976)); see also State v. Price, 491 So.2d 536, 536-37 (Fla.1986) (“A third person’s attempt to influence a witness is inadmissible on the issue of the defendant’s guilt unless the defendant has authorized the third party’s action.”); Manuel v. State, 524 So.2d 734, 735 (Fla. 1st DCA 1988) (noting that testimony concerning witness intimidation is admissible “provided the attempt was with the authority, consent, or *1262 knowledge of the defendant”).[2] It is admissible because it is “evidence of a consciousness of guilt,” and there is nothing more sacred than judicial proceedings that are free from attempts to tamper with or intimidate witnesses. See Coronado v. State, 654 So.2d 1267 (Fla. 2d DCA 1995). Indeed, without a judicial proceeding free of intimidation and threats, there is no reason for the fact-finding process. The decision to permit evidence of unscrupulous conduct, however, is tempered by those “circumstances where testimony concerning third-party threats may ... be deemed so prejudicial as to require its exclusion” despite otherwise being admissible according to the evidentiary rules. See Koon, 513 So.2d at 1256 (citing State v. Price, 491 So.2d 536 (Fla.1986)).
The trial court addressed the alleged intimidation as two separate issues: (1) whether sufficient evidence was presented to introduce into evidence the fact that a disciplinary proceeding had been filed against Dr. Wolf by the Florida Department of Health (DOH); and (2) whether the defense attempted to intimidate Dr. Wolf prior to her deposition. The trial court allowed Special to only proffer Dr. Wolfs testimony on these issues. We evaluate each allegation in turn.

Department of Health Complaint

After the initiation of the lawsuit against Dr. Baux, a DOH complaint was initiated against him. To assist in the defense of Dr. Baux, his attorney, Eugene Ciotoli, hired Dr. Stephen Factor as an expert. Dr. Factor reviewed the slides from the autopsy, and contrary to Dr. Wolfs conclusion, determined that the slides showed widespread proof of AFE.
The record reveals that subsequently, a Dr. Katims, at DOH, recommended in a memorandum that
we open a file on Barbara Wolf, M.D., the medical examiner who did the initial autopsy and specifically indicated that she found no evidence of amniotic fluid embolus. At the request of a defense attorney, another pathologist reviewed the tissue and apparently cut new sections and found evidence of widespread embolism from amniotic fluid. This is a serious error and we should open the file so that we may deal with it appropriately.
When DOH issued a formal complaint against Dr. Wolf, she hired counsel, William Pincus, to defend her.
Special sought to introduce evidence of the DOH complaint against Dr. Wolf as evidence of witness tampering. However, the trial court concluded that there was an insufficient link between the defense and the filing of the complaint. The trial court precluded testimony “with respect to the [DOH] investigation ... [because] I don’t believe there’s a sufficient evidentiary nexus to allow us to go there [and address witness intimidation] at this point. [Dr. Wolf] doesn’t know who filed [the complaint that led to the disciplinary proceeding], and we can surmise who may or may not have, but I don’t think we have enough to go there.” We agree.
*1263 Dr. Factor’s observations were made during the course of his role in defending Dr. Baux’s DOH matter, and it appears that the defense attorney request referenced in the memorandum from Dr. Ka-tims was a request that Dr. Factor review the slides in order to assist in defending Dr. Baux — not a request that DOH issue a complaint against Dr. Wolf. The evidence in the record demonstrates that DOH initiated its investigation of Dr. Wolf in light of Dr. Factor’s conclusions, not because of a specific request by the defense. Thus, we agree with the trial court’s conclusion that there was an insufficient factual basis to attribute the DOH complaint against Dr. Wolf to Baux or West Boca. Thus, this evidence was properly excluded.

Statements to Dr. Wolf

Although we agree with the trial court’s exclusion of evidence relating to the DOH complaint, we conclude that the trial court erred when it excluded evidence of witness tampering in the form of statements made to Dr. Wolf through her attorney. Special was precluded from introducing Dr. Wolfs testimony about the statements because the trial court concluded that while relevant, the evidence constituted double hearsay. As we explain, the jury was entitled to hear this evidence.
About three months after the filing of the DOH complaint against Dr. Wolf, Dr. Wolf was deposed by the defense. According to Dr. Wolf, just before the deposition, her lawyer (William Pincus) told her of statements from Dr. Baux’s defense counsel (Eugene Ciotoli). Allegedly, Mr. Ciotoli suggested to Mr. Pincus that Dr. Wolf might not want to embarrass herself by maintaining that the autopsy showed no evidence of AFE and that a world-renowned AFE expert was going to contradict her opinion and testify that the slides on which she saw no evidence of AFE were actually replete with evidence of AFE. Dr. Wolf was handed photographs of the slides just before the deposition, which she reviewed, and ultimately determined that her opinion was the same, that there was no evidence of AFE on the slides. At trial, Special proffered the following testimony from Dr. Wolf:
SPECIAL: Please tell us what you were told and by who?
DR. WOLF: I was informed by Mr. Pinkus [sic] that, as he phrased it, I would not want to embarrass myself according to the defense attorney, by disagreeing with Dr. Factor, who was identified to me as the defense expert involved in the Board of Medicine complaint.
SPECIAL: And—
DR. WOLF: I’m sorry.
SPECIAL: Go ahead.
DR. WOLF: I was also given a note. Mr. Ciotoli gave my lawyer, who was also present, who then gave to me a notebook containing a number of photographs that were identified as being photographs taken by Dr. Factor of the slides in this case that allegedly demonstrated the presence of amniotic fluid.
SPECIAL: All right. How, did you— the information that you got regarding not wanting to go up against Dr. Factor, was that information provided to you by your lawyer that he got from the defense lawyer, is that how you understood it? .
DR. WOLF: Yes, it was.
Dr. Wolf did not change her opinion that the autopsy did not reveal evidence of AFE, nor her conclusion that Susan did not die of AFE. But, she stated during her proffered testimony that she believed that the statements and related conduct were an attempt to get her to change her testimony:
*1264 SPECIAL: Okay. What did you think after you looked at the pictures, after you heard what you had been told first, that it was supposedly on these slides, and then you looked at these pictures and it wasn’t there. What did you think somebody was attempting to do to your testimony?
DR. WOLF: By being offered that, being shown these photographs immediately before my deposition, I assumed that an attempt was being made to change my mind.
SPECIAL: And you were not intimidated in that regard, were you?
DR. WOLF: Certainly not.
This relevant evidence was admissible. In Jost v. Ahmad, the Second District Court of Appeal addressed an allegation of witness tampering in a medical malpractice case. Jost, 730 So.2d 708, 710 (Fla. 2d DCA1998). The plaintiffs treating physician testified that the hospital’s insurance carrier contacted the physician’s risk management officer, and the carrier attempted to pass along information to the physician suggesting that he should remember that his “testimony was to limit collateral damage.” Id. at 709-10. The trial court denied the plaintiffs request to question the physician about the communication before the jury. Id. at 710. The Second District held that the trial court reversibly erred by excluding the communication because attempts at witness intimidation are “ ‘fundamentally unfair and pervert the truth-seeking function.’” Id. at 711 (quoting McCool v. Gehret, 657 A.2d 269 (Del.1995)). The district court explained that to determine whether the communication should be admitted, the “threshold question [wa]s whether the matter is relevant,” which “turns on the meaning of the communication as it could be reasonably understood by [the targeted witness].” Id. at 710. With this question in mind, the Second District concluded that the excluded testimony should have been admitted as both impeachment and substantive evidence. See id. at 711. -
Evidence of this nature “need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not.” McQueeney v. Wilmington Trust Co., 779 F.2d 916, 921 (3d Cir.1985). In this case, it is more probable than not that a third party with the “authority, consent, or knowledge” of Baux, if not West Boca as well, attempted to influence Dr. Wolf and alter her testimony. See Manuel, 524 So.2d at 735 (citing Price, 491 So.2d 536). Neither Baux nor West Boca has provided this Court with a reason to conclude that some other person or party would have had a motive to harass Dr. Wolf as occurred here, and it is unlikely that some other person or party would have been privy to and interested in Dr. Wolfs conclusions regarding the cause of Susan’s death. The circumstances strongly suggest that the defense or someone working on behalf of the defense was responsible for the events that occurred prior to Dr. Wolfs deposition, and that party intended to and did exert pressure on Dr. Wolf in an effort to change her opinion.
Special satisfied the requirements in Jost that the challenged testimony must be relevant and the communication reasonably understood by the targeted witness as an attempt to intimidate. First, in its order, the trial court properly found Dr. Wolfs testimony to be relevant. This testimony concerned the key issue in this case — the cause of Susan’s death. Second, although Dr. Wolf may not have changed her testimony nor been intimidated, she understood the intent of the events preceding her deposition to be an effort to alter her conclusion.
*1265 Moreover, because the intimidating parties were acting as agents of Baux, the trial court’s hearsay concerns are eliminated. Compare Jost, 730 So.2d at 710 (permitting admission of communications to the targeted doctor from the defendant’s insurance carrier, which is “akin to a communication from [the defendant] ... [and not akin to] a communications from a third party with no direct interest in the outcome of the case.”), with Nagel v. State, 774 So.2d 835, 838 (Fla. 4th DCA 2000) (ruling that a police officer’s testimony was inadmissible because the state did not present evidence that the contested telephone call “was made with appellant’s authority, consent, or knowledge”). The trial court’s failure to admit testimony on this issue amounted to an abuse of discretion, and in light of the harmful error caused by the exclusion of this evidence, a new trial is required.
CONCLUSION
For. the foregoing reasons, in a civil appeal, the test for harmless error requires the beneficiary of the error to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error complained of contributed to the verdict. We reverse the district court’s decision and remand for proceedings consistent with this opinion.
It is so ordered.
QUINCE and PERRY, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion.

. The harmless error rule contained in section 59.041 was codified in 1911 and has not substantively changed since that time.

. In Lynch v. McGovern, 270 So.2d 770, 772 (Fla. 4th DCA 1972) (quoting Wigmore on Evidence, Vol. 2 (3d ed.), section 278, at 120), the Fourth District stated:
* * * it has always been understood — the inference, indeed, is one of the simplest in human experience — that a party’s falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause’s lack of truth and merit (emphasis added).