LEWIS, J.,
specially concurring in part and dissenting in part.
I concur with the well-reasoned and intellectually direct majority opinion as it accepts and adopts the standard for review that the beneficiary of the error must establish that there is no reasonable possibility that the error contributed to the verdict to uphold application of harmless error. I also concur with the common sense and logical majority opinion and conclude that the failure of the trial court to permit the jury to hear testimony from Dr. Dildy concerning the extremely high rate of amniotic fluid embolus (AFE) diagnoses at West Boca constitutes harmful error that merits a new trial. I write separately only because I believe that additional justifications not mentioned by the majority explain why the harmless error test adopted today is appropriate in all civil appeals. Further, contrary to the majority in one limited area, I would permit the full exploration and further development of both allegations of witness intimidation in connection with the new trial proceedings.
The Harmless Error Standard
I agree with the majority’s conclusion that the “no reasonable possibility” harmless error standard preserves judicial resources, protects the integrity of the judicial process, and strikes the appropriate balance between parties. Equity and logic demand that the burden of proving an error to be harmless must be placed on the party who improperly introduced the evidence. Placing the burden on the party that introduced the error serves not only to penalize the offending party, but also discourages future efforts to introduce error into proceedings. If we were to place the burden of proof on the party against whom the evidence is used, we would simply encourage the introduction of improper evidence. Gormley v. GTE Prod. Corp., 587 So.2d 455, 459 (Fla.1991); see also Sheffield v. Superior Ins. Co., 800 So.2d 197, 203 (Fla.2001) (‘‘[W]hen a trial lawyer leads a judge into an obvious error ... cries of harmless error on appeal are likely to fall on deaf ears.”) (quoting Mattek v. White, 695 So.2d 942, 944 (Fla. 4th DCA 1997)).
However, I also believe that DiGuilio’s pervasiveness in harmless error assessments underscores why this Court should not depart from it by adopting a different standard for civil proceedings. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Developing a different standard would only foster inconsistency and confusion in Florida law. See McQueeney v. Wilmington Trust Co., 779 F.2d 916, 927 (3d Cir.1985) (discussing the varying standards of review in civil cases, and why creating a different test for harmless error in the civil versus criminal context would only add unnecessary confusion and complication for the courts). Furthermore, by *1273 applying the DiGuilio test in the civil context, we signal to litigating parties that our courts will not review allegations of error lightly, nor perpetuate such errors by affording them less scrutiny than the “reasonable possibility of affecting the verdict” standard provides. Further, by applying the DiGuilio test, we endorse a public policy that discourages any increase in the number of errors that our courts deems harmless. See McQueeney, 779 F.2d at 927 (“[B]road institutional concerns militate against increasing the number of errors deemed harmless.”).
In DiGuilio, we addressed the relevant statutory authority, and explained why section 924.33, Florida Statutes (1981), applied as opposed to section 59.041. See 491 So.2d at 1133-34. Section 924.33 provides:
No judgment shall be reversed unless the appellate court is of the opinion, after an examination of all the appeal papers, that error was committed that injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant.
This section is part of chapter 924, which is titled “Criminal Appeals and Collateral Review.” § 924.33, Fla. Stat. (2003). The DiGuilio Court stated that section 924.33 applied because that statute: (1) applies to all judgments regardless of the type of error involved; and (2) explicitly provides that there shall be no presumption that errors are reversible unless it can be shown that they are harmful. See 491 So.2d at 1133-34. Although section 59.041 did not apply in DiGuilio, the differences between this section and section 924.33 are not such as to render DiGuilio’s analysis inapposite. Section 59.041 provides:
No judgment shall be set aside or reversed, of new trial granted by any court of the state in any cause, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case it shall appear that the error complained of has resulted in a miscarriage of justice. This section shall be liberally construed.
§ 59.041, Fla. Stat. (2003) (emphasis supplied). The plain language of this section demonstrates that the Legislature has specifically and unambiguously elected not to apply a different harmless error standard in criminal and civil cases.[3]
Justice Pariente, in her concurring in part and dissenting in part opinion, criticizes the majority for “favoring form over substance” and adopting a harmless error standard in civil cases that is inconsistent with the clear legislative directive articulated in section 59.041. She claims that the majority has ignored critical factors, such as the differing burdens of proof and other “particular attributes” that distinguish civil from criminal cases, and contends that the DiGuilio standard is inapplicable in civil cases. Justice Pariente simply comingles and confuses trial level burdens of proof and trial level “particular attributes” with appellate standards of legal error. The level of a factual burden of proof during trial has nothing to do with the standards for appellate legal error. In criticizing the majority’s analysis, Justice *1274 Pariente has also neglected to consider the deference this Court has traditionally afforded the Legislature for policy decisions that have been made regarding the harmless error standard. In fact, we specifically recognized in DiGuilio that the “authority of the legislature to enact harmless error statutes is unquestioned.” 491 So.2d at 1134.
Here, the Legislature has established through section 59.041 the public policy that appellate courts shall not reverse trial court judgments “in any cause, civil or criminal,” unless the error complained of has resulted in a miscarriage of justice. It certainly cannot be disputed that the Legislature was unaware when it made this policy decision that the trial level burden of proof differs in civil and .criminal cases, or that other “particular attributes” differentiate the two types of cases. However, because Justice Pariente considers the Legislature’s policy determinations to be inconsistent with her view, she basically ignores them altogether. Justice Pariente relies upon the “particular attributes” approach to conclude that the “more likely than not” standard developed by the Fourth District is appropriate in all civil cases. This approach, however, not only disregards our holding in DiGuilio that recognized the Legislature retains broad authority to regulate the application of harmless error statutes, but also completely ignores the plain language of section 59.041. In so doing, Justice Pariente has essentially concluded that section 59.041 is irrelevant and should not impact the determination of the appellate standard for legal error that should apply in civil cases. While Justice Pariente and other lower court judges may not agree with the statutes, it is inappropriate for them to suggest that their personal views of the applicable harmless error standard should trump the standard contained in the statutory structure. Justice Pariente advances a dual standard for civil and criminal cases contrary to the single standard established in the Florida Statutes.
Additional Harmful Error
I disagree only with the majority’s determination that the trial court did not err when it precluded Special from further exploring and presenting evidence that strongly suggested that Baux and West Boca attempted to intimidate the key fact witness, medical examiner Dr. Wolf, regarding the Department of Health (DOH) complaint. The decision to preclude Dr. Wolfs testimony on this important subject amounted to an abuse of discretion and was not harmless error. With a remand for a new trial, I would permit further exploration and development of material facts on this issue.
Standard of Review
A trial court’s decision to admit evidence is reviewed under the abuse of discretion standard. See Braddy v. State, 111 So.3d 810, 858 (Fla.2012), cert. denied, — U.S. -, 134 S.Ct. 275, 187 L.Ed.2d 199 (2013); Simmons v. State, 934 So.2d 1100, 1116 (Fla.2006) (“A trial court has wide discretion concerning the admissibility of evidence and the range of subjects about which an expert can testify.”). A court’s discretion, however, is circumscribed by the rules of evidence, see Johnston v. State, 863 So.2d 271, 278 (Fla.2003), and a ruling on the admissibility of evidence will constitute an abuse of discretion if it is based “on an erroneous view of the law or on a clearly erroneous assessment of the evidence.” Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); Johnson v. State, 969 So.2d 938, 949 (Fla.2007).
Here, the precluded testimony concerned whether there had been an extrajudicial attempt to intimidate and discredit Dr. Wolf, the medical examiner, because *1275 she disagreed as to the cause of Susan’s death — the dispositive issue in this case. Dr. Wolf, as the governmental expert charged with investigating deaths, expressed the opinion that Susan did not die from AFE. Because there is a very real and reasonable view that the failure to admit testimony on this issue also contributed to the verdict, I disagree with the majority’s conclusion that the decision to preclude evidence on this testimony was harmless and not an abuse of discretion.
Analysis
Florida courts permit evidence of threats or witness intimidation if the threats are attributable to the opposing party. See Koon v. State, 513 So.2d 1253, 1256 (Fla.1987) (“It has been held that evidence of threats made against witnesses is inadmissible to prove guilt unless the threats are shown to be attributable to the defendant.” (citing Duke v. State, 106 Fla. 205, 142 So. 886 (1932); Jones v. State, 385 So.2d 1042 (Fla. 1st DCA 1980); Coleman v. State, 335 So.2d 364 (Fla. 4th DCA 1976))); see also State v. Price, 491 So.2d 536, 536-37 (Fla.1986) (“A third person’s attempt to influence a witness is inadmissible on the issue of the defendant’s guilt unless the defendant has authorized the third party’s action.”); Manuel v. State, 524 So.2d 734, 735 (Fla. 1st DCA 1988) (noting that testimony concerning witness intimidation is admissible, “provided the attempt was with the authority, consent, or knowledge of the defendant”).[4] It is admissible because it is “evidence of a consciousness of guilt,” see Coronado v. State, 654 So.2d 1267, 1269 (Fla. 2d DCA 1995),[5] and there is nothing more sacred than judicial proceedings that are free from attempts to tamper with or intimidate witnesses. Indeed, without a judicial proceeding free of intimidation and threats, there is no reason for the fact-finding process. The decision to permit evidence of unscrupulous conduct, however, is tempered by those “circumstances where testimony concerning third-party threats may ... be deemed so prejudicial as to require its exclusion” despite otherwise being admissible according to the evidentiary rules. See Koon, 513 So.2d at 1256 (citing Price, 491 So.2d at 536).
In Jost v. Ahmad, the Second District Court of Appeal addressed an allegation of witness tampering in a medical malpractice case. 730 So.2d 708, 710 (Fla. 2d DCA 1999). The plaintiffs treating physician testified that the hospital’s insurance carrier contacted the physician’s risk management officer, and the carrier attempted to *1276 pass along information to the physician suggesting that he should remember that his “testimony was to limit collateral damage.” Id. at 709-10. The trial court denied the plaintiff’s request to question the physician about the communication before the jury. Id. at 710. The Second District held that the trial court reversibly erred by excluding the communication because attempts at witness intimidation are “fundamentally unfair and pervert the truth-seeking function.” Id. at 711 (quoting McCool v. Gehret, 657 A.2d 269, 276 (Del.1995)). The same rule applies here. The district court explained that to determine whether the communication should be admitted, the “threshold question [wa]s whether the matter is relevant,” which “turns on the meaning of the communication as it could be reasonably understood by [the targeted witness].” Id. at 710. With this question in mind, the Second District concluded that the excluded testimony should have been admitted as both impeachment and substantive evidence. See id. at 711.
Here, during trial, Special asserted that he should be permitted to present evidence that individuals, on behalf of Baux and West Boca, attempted to intimidate Dr. Wolf into changing her expert opinion that AFE was not the cause of Susan’s death. According to Dr. Wolfs attorney Bill Pincus, Baux’s attorney had told him that “the Defendants had hired a ‘nationally-renowned’ expert in the field of amniotic fluid embolism (‘AFE’) who had found ‘pervasive evidence’ of AFE in the tissue samples taken from the Decedent” and “suggested that Dr. Wolf may not want to ‘embarrass herself by seeking to defend her earlier conclusions (of no evidence of AFE)-” Prior to this conversation, and it is arguable although not fully developed “at the request of a defense attorney,” a complaint had even been filed with DOH against Dr. Wolf, which jeopardized her medical license. Dr. Wolf learned of this complaint immediately prior to her deposition with defense counsel, during which she had to discuss and defend her conclusion that AFE was not the cause of Susan’s death. Full evidence concerning this attempted intimidation should be disclosed and explored.
The trial court addressed the alleged intimidation as two separate issues: (1) whether sufficient evidence was presented to. introduce into evidence the fact that a disciplinary proceeding had been filed against Dr. Wolf by DOH; and (2) whether individuals had attempted to intimidate Dr. Wolf prior to her deposition. The trial court only allowed Special to proffer Dr. Wolfs testimony on these issues. Although the trial court found the testimony addressing witness tampering with regard to activities occurring prior to Dr. Wolfs deposition to be relevant, it ruled that testimony on this issue was inadmissible because it constituted double hearsay. The trial court also precluded testimony “with respect to the [DOH] investigation ... [because] I don’t believe there’s a sufficient evidentiary nexus to allow us to go there [and address witness intimidation] at this point. [Dr. Wolf] doesn’t know who filed [the complaint that led to the disciplinary proceeding], and we can surmise who may or may not have, but I don’t think we have enough to go there.”
The trial court’s concern regarding the evidentiary nexus between Dr. Wolfs testimony and the apparent witness intimidation is misplaced. It is clear that a third party with the “authority, consent, or knowledge” of Baux, if not West Boca as well, attempted to influence Dr. Wolf apd alter her testimony. See Manuel, 524 So.2d at 735. No other persons or party would have been privy to, and interested in, Dr. Wolfs conclusions regarding the cause of Susan’s death. Who else would *1277 have asked Dr. Wolf to reconsider her earlier conclusions? Who else would have initiated a complaint with DOH against Dr. Wolf? Who else would have had a personal interest in her testimony? The answers to these questions indicate that the defense or someone working on behalf of the defense was responsible for the events that occurred prior to Dr. Wolfs deposition, and that party intended to, and did, exert pressure on Dr. Wolf in an effort to change her opinion. In any event, the evidence should be explored and the truth exposed.
With regard to the dictates of Jost — that the challenged testimony must be relevant and the communication reasonably understood by the targeted witness as an attempt to intimidate — Special appears to have satisfied this standard. First, in its order, the trial court found this testimony to be relevant. Additionally, this testimony concerned the key issue in this case— the cause of Susan’s death. Second, although Dr. Wolf may have neither changed her testimony nor been intimidated, she understood the intent of the events preceding her deposition to be an effort to alter her conclusion. Accordingly, the trial court should have stayed the proceedings and addressed the problem and allegations of intimidation at the time they were brought to the court’s attention. Judicial proceedings must be free from improper efforts to intimidate witnesses and, when that issue arises, courts must be prepared to respond and react lest we allow justice to be undermined. The trial court’s failure to do so, and thereby ensure that the trial was not tainted by extraneous influences, was not a harmless error. The trial court’s failure to admit testimony on this issue amounted to an abuse of discretion.
To the extent that Baux and West Boca allege that this evidence of intimidation is too attenuated to be admitted, I note that evidence of this nature “need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not.” See McQueeney, 779 F.2d at 921. Here, Special provided sufficient support for the trial court to rule the testimony admissible and deserving of the jury’s consideration. Consequently, this testimony should have been admitted as substantive evidence of Baux and West Boca’s lack of faith in their defense that AFE caused Susan’s death. Most certainly, if further evidence is available, it must be considered in connection with a new trial.
Moreover, if in fact these activities were concerted efforts to intimidate Dr. Wolf, it is appropriate to conclude that they derived from parties who acted with the “authority, consent, or knowledge” of Baux, if not West Boca as well. See Manuel, 524 So.2d at 735. Neither Baux nor West Boca has provided this Court with a reason to conclude that some other person or party would have had a motive to harass Dr. Wolf as occurred here. Additionally, because the intimidating parties were acting as agents of Baux, the trial court’s hearsay concerns are eliminated. Compare Jost, 730 So.2d at 710 (permitting admission of communications to the targeted doctor from the defendant’s insurance carrier, which is “akin to a communication from [the defendant] ... [and not akin to] a communications from a third party with no direct interest in the outcome of the case”), with Nagel v. State, 774 So.2d 835, 838 (Fla. 4th DCA 2000) (ruling that a police officer’s testimony was inadmissible because the state did not present evidence that the contested telephone call “was made with appellant’s authority, consent, or knowledge”).
Based on the relevance of the testimony to both the very core issue of the litigation (the AFE diagnosis), and demonstrated ef *1278 forts to change or silence contradictory evidence concerning the cause of Susan’s death, I would conclude that the erroneous rulings by the trial court amounted to harmful error. The evidence of witness tampering was relevant to the theory of causation espoused and should have been admitted as substantive evidence to discredit those involved in the efforts. The failure of the trial court to admit this testimony constituted an abuse of discretion and this Court should not conclude that there is no reasonable possibility that these errors did not affect the deliberations of the jury and its determination that Baux and West Boca were not responsible for Susan’s death. See DiGuilio, 491 So.2d at 1135.
In conclusion, I would remand this case for a new trial because without the evidence excluded here, the fairness and integrity of this litigation has been compromised.
POLSTON, J., dissents with an opinion in which CANADY, J., concurs.

. Section 90.104, Florida Statutes (2009), is also applicable to the instant case. It addresses rulings on evidence and provides that
(1) A court may predicate error, set aside or reverse a judgment, or grant a new trial on the basis of admitted or excluded evidence when a substantial right of the party is adversely affected ... [and the issue is preserved].

. In Lynch v. McGovern, 270 So.2d 770, 772 (Fla. 4th DCA 1972) (quoting Wigmore on Evidence, Vol. 2 (3d ed.), section 278, at 120), the Fourth District stated:
* * * it has always been understood — the inference, indeed, is one of the simplest in human experience — that a party’s falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause’s lack of truth and merit (emphasis added).

. See also Edward W. Cleary, McCormick on Evidence, § 273, at 660 (2d ed. 1972) (footnotes omitted):
[W]rongdoing by the party in connection with his case, amounting to an obstruction of justice[,] is also commonly regarded as an admission by conduct. By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means. Accordingly, a party’s false statement about the matter in litigation, whether before suit or on the stand, his fabrication of false documents, his undue pressure, by bribery or intimidation or other means, to influence a witness to testify for him ... all these are instances of this type of admission by conduct.