694 So.2d 827 (1997)
CHASE MANHATTAN MORTGAGE CORPORATION, a Florida Corporation f/k/a Chase Home Mortgage Corporation, Appellant,
v.
SCOTT, ROYCE, HARRIS, BRYAN, BARRA & JORGENSEN, P.A., and Gary J. Nagle, Appellees.
No. 96-1742.
District Court of Appeal of Florida, Fourth District.
May 21, 1997.
Rehearing and Clarification Denied June 18, 1997.
*829 Steven Ellison of Broad and Cassel, West Palm Beach, and Gary C. Tepper of Arent Fox Kintner Plotkin & Kahn, Washington, DC, for appellant Chase Mortgage Services, Inc., f/k/a Chase Manhattan Mortgage Corporation.
John L. Bryan, Jr. and Kevin M. Wagner of Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A., Palm Beach Gardens, for appellees.
FARMER, Judge.
Apparently we are the first Florida court to confront the precise issue raised in this case. The question presented is whether a purchaser of home mortgage loans in the secondary market can be liable in negligence to the closing agents for the original lender when the original lender's checks to the closing agents for closing proceeds have been dishonored. Under the facts of this case, we hold that there can be no such liability and reverse a judgment to the contrary.
Appellant (Chase) is engaged in mortgage lending. In addition to originating its own loans, Chase purchases mortgages from various lenders in the secondary market. This practice is called correspondent lending, and the lenders from whom such loans are purchased are called correspondents. One of Chase's regular correspondents was Abbey Financial Corporation (Abbey). In February 1993, Abbey and Chase entered into the agreement that would govern their relationship until late 1993, when a boom in refinancing home mortgages occurred.
Under the initial agreement, Abbey would originate and fund its own mortgages. After the closing and funding of each mortgage whereby Abbey had become a holder in due course, Abbey would immediately sell the mortgage paper to Chase. Under applicable federal law, even if the transaction was a refinance, the borrower had a 3-day right of rescission. Because Abbey could not sell and transfer the mortgage paper to Chase until after Abbey had completely closed and funded the mortgagee, Abbey bore the risk that the borrower would exercise the 3-day right of rescission and cancel the transaction. Moreover, according to a letter that apparently preceded the agreement between Chase and Abbey, Chase would review Abbey's financial status and establish a maximum loan exposure. Chase actually had fixed the limit of Abbey's portfolio at $15,000,000 per month.
In late 1993 and early 1994, declining interest rates caused a surge in the refinancing of home mortgages. Chase initiated a streamline process with Abbey to speed up loan processing. Using that procedure, Abbey need send Chase only certain key documents whereupon Chase would disburse funds within 24-48 hours of receipt of those documents. Those key documents included the mortgagor's original promissory note and mortgage, having been duly endorsed by Abbey to Chase, along with an assignment of the mortgage.
The streamline process resulted in Chase becoming a holder of refinanced loans before the expiration of the three day rescission period. At the same time, Chase funded the loans so quickly that Abbey was able to pyramid the funds received and increase their loan volume significantly beyond the maximum that had been originally established by Chase and far beyond Abbey's financial capabilities. At some point, Chase realized that the streamline process resulted in funding before the lapse of the rescission period and ceased the early financing. When they did, Abbey filed bankruptcy.
Abbey had engaged a law firm and an individual attorney to handle closings on its refinance loans. On some closings, these closing agents disbursed their own funds to the mortgagors before Abbey's checks to the closing agents had actually cleared. As a result, the closing agents lost money on several NSF checks after Chase stopped purchasing refinanced mortgages from Abbey. The closing agents thereupon sued Chase, alleging negligent failure to warn them of Abbey's impending insolvency. Their complaint based liability on: (1) an agency relationship between Chase and Abbey; (2) a joint venture between Chase and Abbey; or *830 (3) direct conduct by Chase toward the closing agents, as to whom Chase was said to have owed a duty. After a bench trial, the trial court entered final judgment in favor of the closing agents, and this appeal followed in due course.
Chase's single contention on appeal is that the evidence adduced at trial was insufficient to support the legal conclusion that Chase owed a duty to Abbey's closing agents under any theory alleged. Chase argues that the sole finding by the trial judge regarding their duty to closing agents was that:
"Because of CHASE's superior knowledge, because of the way the streamline process had been set up by CHASE and Abbey and because it was certain that the closing agents would suffer harm, CHASE had a duty to warn them of the impending disaster.
Chase argues that mere knowledge alone is an insufficient basis from which to imply a duty to warn. Moreover, Chase requests that we direct entry of judgment in their favor because the written agreement between the parties is insufficient to establish either an agency or a joint venture relationship between Chase and Abbey permitting an imputation of Abbey's delict to Chase. We agree.
The only finding in the final judgment that would support a conclusion that Chase owed an independent duty to closing agents is that cited by Chase, and we agree that knowledge alone is clearly insufficient to impose such a duty. Unless there was a joint venture between Chase and Abbey or an agency relationship that would give rise to a duty to warn closing agents of Abbey's insolvency, there is no evidence of any relationship from their contract that would make Chase directly liable to closing agents. There is no record evidence that Chase engaged in any conduct that would pose a risk to closing agents as a foreseeable victim. See Palmer v. Shearson Lehman Hutton, Inc., 622 So.2d 1085 (Fla. 1st DCA 1993) (defendant owes no duty to warn those placed in danger by another's conduct unless defendant has a special relationship with the foreseeable victim of such conduct); McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992) ("Where a defendant's conduct creates a foreseeable zone of risk, the law will generally recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses."). In light of the absence of a legal basis to impose a duty on Chase, there must be evidence of a special relationship sufficient to charge Chase with liability.
Closing agents concede that either an agency or joint venture relationship between Chase and Abbey is therefore a prerequisite to any finding of liability. They argue, however, that the following findings are sufficient to define a joint venture between Chase and Abbey:
"In effect, the streamline process was designed to achieve a series of transactions under which Abbey and CHASE both sought a profit from the refinance boom that occurred. It is manifest from the record that CHASE was functionally involved in every aspect of the streamline process after Abbey found a potential borrower. CHASE reviewed the credit applications and decided to approve or disapprove the loans, without charging Abbey any fee for this service, before Abbey committed to the ultimate borrower. CHASE, on the loans which were approved by it, assigned the loans a CHASE loan number before Abbey made any commitment to the borrower. CHASE entered the transaction into its computer system before Abbey made any commitment to the borrower. CHASE and Abbey set up the streamline process so that CHASE would actually fund the transaction with CHASE's money, rather than Abbey funding it with Abbey's money and so that CHASE would actually own the note and mortgage at the time funds were disbursed on the transaction. The record leaves no room to doubt that CHASE was wholly integrated into each step of the venture.
"Both CHASE and Abbey anticipated sharing in profits from the streamline process. These anticipated profits for both Abbey and CHASE were greater than would could [sic] have been achieved under the prior written Option 3 Agreement. *831 Both CHASE and Abbey ultimately shared in the losses. In essence, CHASE provided the funds and the underwriting while Abbey found the borrowers. CHASE and Abbey were inextricably joined at every step of the transaction under the streamline process."
Closing agents explain that Chase and Abbey substantially altered the original written agreement between them, so that the relationship of the parties changed drastically from the one defined in the original contract.
We agree with Chase that there is no legal basis upon which the court could hold Chase liable for Abbey's actions under the theory of joint venture. The essential elements of a joint venture are: (1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained. Kislak v. Kreedian, 95 So.2d 510, 515 (Fla.1957). As the court explained in Kislak:
"Inherent in contracts of this nature is the right and the authority of any one of the co-adventurers to bind the others with reference to the subject matter of the coadventure. On this question we said in Boyd v. Hunter, 1932, 104 Fla. 561, 565, 140 So. 666, 667:
`Several essential elements are lacking to constitute this transaction a joint venture between the parties. The complainant, so far as the record shows, had no authority to sell or to offer the land for sale. She had no authority to bind the defendant in any manner in connection with the transaction and the defendant had no authority to bind her. She acquired no interest, either in trust or otherwise, in the land.'
In the case of Proctor v. Hearne, [100 Fla. 1180, 1187, 131 So. 173, 176],
`Each one of several joint adventurers has power to bind the others in matters which are strictly within the scope of the joint enterprise.'
In that case we applied this principle in holding that one of the parties to a joint adventure was personally liable on a mortgage executed by his co-adventurer on the land which constituted the subject matter of the enterprise."
95 So.2d at 514-515. Entirely lacking in this case is any evidence of a right of control by Chase as to the subject of the alleged venture or of the right to share profits and losses. Abbey was free to make mortgage loans to anyone on any terms of its own choosing, but if it desired to have Chase purchase them Abbey would necessarily have to conform such a mortgage to Chase's standards. Compliance with Chase's lending standards does not constitute control by Chase over Abbey for purposes of joint venture law.
Closing agents argue that the elements for a joint venture are found in the streamline process. They contend that implementation of the streamline process transformed the original contract between Chase and Abbey into a joint venture relationship containing all of the elements noted above. It is clear, however, from the evidence that the streamline process altered only the method by which Chase funded the purchases of mortgage paper from Abbey. Chase and Abbey dealt at arms length, with Chase deciding on each individual mortgage whether to purchase the paper. It is thus not surprising that Abbey conformed its mortgage lending to Chase's policies, for it would have been unable to sell the paper to Chase if the loans did not meet Chase's standards for purchase. That hardly meets the essential criterion of the joint venture device.
Closing agents broadly define the common purpose of an alleged joint venture between Chase and Abbey as the receipt of profits, but that is far too amorphous to constitute the kind of common purpose defined in Kislak. The cases on joint venture require a stronger link than the mere quest for profits. We find the reasoning of Tidewater Const. Co. v. Monroe County, 107 Fla. 648 146 So. 209 (1933), directly on point. In Tidewater, a construction company had contracted with the city to construct the roads and bridges. The contract at issue, however, was a second contract between the construction company and a paving company for the surface treatment of the roads. Specifically, the contract *832 provided that the paving company would oil the roads for a nominal daily fee and one half of all net profits at the completion of the project. In holding that the contract between the parties did not establish a joint venture, the court reasoned as follows:
"We think it is apparent from the agreement between the paving company and the construction company that the paving company was concerned only with the job of oiling. It had nothing to do with the clearing, grading, or paving of the roads. There was no privity of contract between it and the county. The contract between the county and the Tidewater Company for the construction of the boulevard and roads had been assigned to the Key West Construction Company several months before the agreement was made between the Phoenix Asphalt Paving Company and the Key West Construction Company.
"As shown by the cases above cited, the question of whether the parties to a particular contract have created between themselves the relationship of joint adventurers is dependent upon their intentions, which is to be determined in accordance with the ordinary rules covering the interpretation of contracts; that joint adventurers are entitled to share in the profits, and must also share the losses, if any; that a joint adventure is very similar to a partnership, the chief distinction being that a joint adventure is usually limited to a single transaction; that although there may not be any express agreement that the parties shall share in the losses, if any, this must have been implied from the agreement made, and the circumstances surrounding its execution, as having been within the contemplation and intention of the parties....
"It must also be noted that the paving company had no community of interest with the construction company in the capital used in the business. Each company owned certain equipment and continued to own it during the life of the agreement and thereafter. The necessary capital was furnished by the construction company. There was no duty upon the paving company to contribute toward the capital necessary to do the job. The only feature of the contract between the construction company and the paving company which would indicate the relation of joint adventurers or partners was the agreement to share the profit. This alone is not sufficient to constitute the parties partners or joint adventurers."
146 So. at 211. In this case, there is even less on which to find the existence of a joint venture. The parties' profits did not come from a common source: Abbey's profits stemmed from the purchase of the mortgage and a servicing fee paid by Chase, while Chase's profits resulted from payments after purchase of the mortgage. Any losses suffered thus depended on entirely different factors. Thus, even viewing all facts in a light most favorable to closing agents, we cannot find a sufficient evidentiary basis for a finding of a joint venture as a matter of law.
There is also an insufficient basis as a matter of law on which to conclude that Abbey was an agent for Chase. The existence of an agency relationship may be established expressly, or by estoppel, apparent authority, or ratification. The party who seeks to establish the existence of such a relationship carries the burden of proof. Pinon v. International Harvester Co., 390 So.2d 154 (Fla. 3d DCA 1980). A key element in establishing an agency relationship is that of control. In Ortega v. General Motors Corp., 392 So.2d 40 (Fla. 4th DCA 1980), we defined the level of control necessary to find a principal/agent relationship as follows:
"Where the employee is merely subject to the control or direction of the employer as to the result to be procured, he is an independent contractor; if the employee is subject to the control of the employer as to the means to be used, then he is not an independent contractor."
392 So.2d at 42; See also Dorse v. Armstrong World Industries, Inc., 513 So.2d 1265 n. 4 (Fla.1987) (in a true agency relationship, the principal must control the means used to achieve the outcome, and not just the outcome itself). There is no evidence in the record that Chase ever controlled Abbey in the way that a principal controls an agent. Again, the mere fact that Chase set standards *833 for the mortgage paper it would be willing to purchase from Abbey did not amount to an agency control of Abbey by Chase. Abbey was always free to make mortgages under different standards and sell that paper elsewhere. Abbey was obligated to enter into no transactions with Chase, save for those it willingly undertook. In other words, the only control exercised by Chase was to place requirements on Abbey as to the mortgages that Chase would agree to purchase in the secondary market. Accordingly, as we can find no basis in the record to establish any liability by Chase to closing agents, we have no alternative to reversing the judgment in favor of closing agents.
REVERSED AND REMANDED FOR ENTRY OF JUDGMENT IN FAVOR OF APPELLANTS.
STEVENSON and GROSS, JJ., concur.