Forst, J.
This case involves claims against a self-described “personalized healthcare program” for both fraud and negligence related to alleged medical malpractice attributable to one of the program’s affiliated physicians. This purported medical malpractice resulted in serious permanent injury to one of the original plaintiffs. We hold that the trial court made several errors in its consideration of motions for directed verdict made by both parties, and we therefore reverse for a new trial on limited grounds, as set forth below.[1]
*559 Background
MDVIP is in the “concierge medicine market” and provides members with certain medical-care benefits in exchange for an annual fee. In its initial brief, MDVIP explains that a concierge practice gives physicians more time to provide personalized service to patients through greater accessibility and availability and, in exchange for a $1,500 annual membership fee, patients were provided with “a comprehensive annual wellness exam as well as certain convenience factors, including same or next-day appointments, 24/7 access to physicians, smaller physician practices and a personalized wellness plan.” MDVIP does not engage in any actual practice of medicine and does not tell its affiliated physicians how to practice medicine, how to diagnose and treat a patient, what medication to prescribe, or whether to refer a patient to a specialist. At all times relevant to this appeal, a physician named Dr. Metzger was ■ affiliated with MDVIP. Neither Dr. Metzger nor any other physician is a party to the lawsuit at issue here, though he and several other health care providers had been original defendants and were voluntarily dismissed from the suit as a result of pre-trial settlements, leaving MDVIP as the sole defendant at trial.
Original plaintiff Joan Beber (“Plaintiff’) [2] was a patient of Dr. Metzger’s before he was affiliated with MDVIP. When Dr. Metzger made the decision to affiliate with MDVIP, some of his patients, including Plaintiff, attended a presentation about the concierge program offered by MDVIP. At the presentation, prospective patients were told about MDVIP, including how doctors were selected, what hospitals MDVIP worked with, and how a study showed .that MDVIP members were sixty-five percent less likely to be hospitalized. MDVIP also provided the audience with a Frequently Asked Questions booklet, which included an explanation of the relationship between MDVIP and Dr. Metz-ger. This booklet was also mailed to Plaintiff. ■
In a deposition, Plaintiff described three reasons why she chose to join MDVIP: “I think the major reason [for joining MDVIP] was the accessibility of other doctors and other hospitals. That would be number one. [Maintaining a relationship with] Dr. Metzger would be number two, and quick services would be number three, if you want that rated.” Plaintiffs husband also testified that the reason the two joined was because of the offer of “the finest doctors, exceptional doctors.”
The events leading to Plaintiffs injury need not be described at length. To summarize,. she began to experience pain in her leg which, through what the jury determined was Dr. Metzger’s negligence, went undiagnosed and misdiagnosed, until Plaintiff was forced to undergo an above-the-knee amputation. Of particular note, however, are the fact that the main contact Plaintiff had at Dr. Metzger’s office was a nurse, not Dr. Metzger, and the fact that Plaintiff was told that Dr. Metzger did not have admitting privileges at any nearby hospital other than at the then-named Boca Raton Community Hospital.
*560 Plaintiff sued a variety of parties, including Dr. Metzger, but by the time of trial only MDVIP remained as a defendant. Plaintiffs theories against MDVIP were for vicarious liability for Dr. Metzger’s negligence, turning on apparent agency, joint venture, and actual agency, and for misleading advertising and fraudulent misrepresentation related to its marketing statements (collectively, these latter theories are referred to as "the fraud claims”). There were no independent allegations of negligence against MDVIP. Prior to trial, Plaintiff died of cancer unrelated to the alleged negligence, and her husband was substituted .as the main plaintiff as personal representative of her estate..
During trial, MDVIP moved for a directed verdict on the fraud claims, which the trial court denied. On the other hand, the trial court granted Plaintiffs motions for directed verdicts on apparent agency and joint venture. In closing, Plaintiff told the jury that the issues of apparent agency and joint venture “[were] not [] issue[s] for you to determine, it’s already been determined by the Court.” The trial court’s instructions to the jury included telling it that’it was obligated to decide each claim it was considering separate from the others.
•The jury -found in favor of Plaintiff on all claims. It awarded a total of $8,539,289 for mostly non-economic damages: $1,036,288 attributable to the negligence claims and $7,503,001 on the fraud claims. On MDVIP’s motion, the trial court reduced the amount of the-final award based on the non-economic damages caps created by section 766.118, Florida Statutes, which this Court has since determined' are unconstitutional. N. Broward Hosp. Dist. v. Kalitan, 174 So.3d 403, 411 (Fla. 4th DCA 2015); see also Go v. Normil, 184 So.3d 554, 557 (Fla. 4th DCA 2016).
Both parties appealed, with Plaintiffs cross-appeal limited to the Kalitan unconstitutional caps issue.
Analysis

A, MDVIP’s motions for directed verdict on the,fraud claims. ■

This Court reviews motions for directed verdict de novo. Henry v. Hoelke, 82 So.3d 962, 965 (Fla. 4th DCA 2011). “When an appellate court reviews the trial court’s denial of a motion for directed verdict, it must ‘view the evidence and all inferences in a light most favorable to the non-movant, and should reverse if no proper view of the evidence could sustain a verdict in favor of the non-movant.’ ” Conrad v. Young, 10 So.3d 1154, 1157 (Fla. 4th DCA 2009) (quoting Weinstein Design Grp., Inc. v. Fielder, 884 So.2d 990, 997 (Fla. 4th DCA 2004)).
MDVIP moved for directed verdicts on Plaintiffs fraud claims, and the trial court denied those motions. As set forth below, we hold that there is no view of the evidence sufficient to sustain a verdict on the fraud claims and thus reverse the trial court’s denial of MDVIP’s motions for directed verdict.
The phrase “misleading advertising” includes any statements made, or disseminated, in oral, written, or printed form .or otherwise, to or before the, public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such- property or services,
*561 § 817.40(5), Fla. Stat. (2009). “A claim of fraudulent misrepresentation is not actionable if premised on a mere opinion, rather than a material fact.” Thor Bear, Inc. v. Crocker Mizner Park, Inc., 648 So.2d 168, 172 (Fla. 4th DCA 1994). It is the responsibility of the buyer of a product or service to investigate the truth of any “puffing” statements, as such declarations “do not constitute fraudulent misrepresentations.” Wasser v. Sasoni, 652 So.2d 411, 412 (Fla. 3d DCA 1995). A promise to deliver an “exceptional” product or service is a matter of opinion rather than fact, and constitutes non-actionable puffery. See Heath v. Palmer, 181 Vt. 545, 915 A.2d 1290, 1296 (2006) (holding that a representation of “exceptional value” “unquestionably fall[s] within the category of opinion”).
Plaintiffs fraud claims were non-actionable to the extent that they depended on MDVIP’s pledge to provide “exceptional doctors, exceptional care, and exceptional results.” However, neither of the fraud claims depended exclusively on this puffery. We therefore must examine the other, fact-based statements made by MDVIP to determine whether any of those were supported by the evidence.
In the complaint, Plaintiff alleged that MDVIP:
• promised Plaintiff “that she would be seen by the finest national specialists with advanced treatment”;
• “held itself out as being associated with the best hospitals and doctors nationwide”;
• claimed to be “a network fraternity of some of the nation’s finest physicians”;
• stated that Plaintiff’s- specialty care would be “actively coordinate[d]” by Dr. Metzger, including through “personal calls to specialists”;
• defined an “exceptional doctor” as one with “excellent credentials[,] bedside manner, reputation[, and] diagnostic skills”;
• represented that it selected, doctors “based upon [the doctors’] medical expertise and their relationships with patients”;
.• stated that it had a relationship with the Cleveland Clinic and the Miller School of Medicine, and;
• cited statistical data showing that MDVIP patients had sixty-five percent fewer hospitalizations than patients in traditional practices.[3]
Some of these allegations are easily disposed of as puffery alongside the “exceptional doctors, exceptional care, and exceptional results” statement. Those would be the “finest national specialists,” the “best hospitals and doctors,” and the “fraternity of some of the nation’s finest physicians” statements. The status of being the “finest” or the “best” is a matter of opinion, and the allegations of fraud from the use of these terms cannot stand. Similarly, the referenced statements describing what makes ah' “exceptional doctor” are statements of opinion concerning the quality of a doctor’s credentials, bedside manner, reputation, and diagnostic skills.
Once these puffing statements are removed from the analysis, there remain but four allegations of fact that could serve as grounds for the fraud claims: (1) Dr. Metzger would “actively coordinate” Plaintiffs care; .(2) MDVIP’s selection criteria for doctors was based on expertise and patient relationships; (3) MDVIP participated with the Cleveland Clinic and Miller School of Medicine; and (4) data showed a sixty-five percent lower hospitalization *562 rate for MDVIP patients. Our continued analysis focuses only on these statements.[4]
In a fraud claim, there must be evidence of “the [speaker’s] knowledge that the representation is false.” Wadlington v. Cont'l Med. Servs., Inc., 907 So.2d 631, 632 (Fla. 4th DCA 2005) (quoting Cohen v. Kravit Estate Buyers, Inc., 843 So.2d 989, 991 (Fla. 4th DCA 2003)). Here, the evidence did not show MDVIP’s knowledge of falsehood concerning any of the four possible grounds for the fraud claims.
Although Plaintiff did present evidence that Dr. Metzger did not personally actively coordinate Plaintiffs care during portions of the pertinent timeframe, Plaintiff failed to present evidence that MDVIP knew that Dr. Metzger would not do so. Similarly, Plaintiff failed to present evidence that MDVIP knew that Dr. Metzger did not have a relationship with the Cleveland Clinic and Miller School of Medicine. In fact, MDVIP’s participation agreement with Dr. Metzger stated, in relevant part, that “Physician shall promptly coordinate necessary referrals with specialty physician practices,” and required Dr. Metzger to “be accessible to Members by cellular phone or personal pager 24 hours per day, 7 days per week.” These provisions indicate a desire on MDVIP’s part both for Dr. Metzger himself to do the coordination and for coordination to be available with specialty practices such as those available at the Cleveland Clinic and Miller School of Medicine.
Even assuming that MDVIP did know of Dr. Metzger’s lack of admitting privileges at those hospitals—an assumption for which no supporting evidence was admitted—that would not necessarily show that MDVIP knew its more general statement of its partnerships—perhaps through doctors other than Dr. Metzger—was false. Accordingly, Plaintiff failed to introduce any evidence supporting the conclusion that MDVIP knew the above-noted statements (1) and (3) were false at the time it made the representations.
Next, Plaintiff did not introduce evidence showing that MDVIP knew its statements regarding its physician-selection criteria were false or that Plaintiff relied on these representations. See Wad-lington, 907 So.2d at 632 (stating that reliance on a false statement is required for a claim of fraud). In fact, testimony established that the selection criteria was based on “whether or not the patients have a strong relationship with their physician,” which is exactly what MDVIP stated was part of its evaluation. The testimony did not establish that a physician’s expertise was not a part of this evaluation, but rather that the “primary” metric used was patient relationships.[5] The evidence did not show that MDVIP knew its statement regarding selection criteria was false, and in *563 fact showed that the selection criteria represented was in fact the selection criteria used. Furthermore, Plaintiff testified in a deposition that her three reasons for joining MDVIP were the accessibility of other doctors, a continued relationship with Dr. Metzger, and quick services, and the husband added that he joined MDVIP based on the promise of “the finest doctors, exceptional doctors.” Clearly, the principal lure for Plaintiff and her husband was continued accessibility to Dr. Metzger, as well as the availability of a network of experienced specialists, consistent with MDVIP’s marketing. Thus, the statement regarding MDVIP’s selection criteria was not shown to have been known to be false or to have been relied upon to Plaintiffs detriment.
Finally, Plaintiff did not introduce any evidence that showed that MDVIP knew its sixty-five percent statistic was false. There was evidence introduced that called the statistic’s validity into question, but the issue of the statistic being misleading based on methodology is different from the issue of MDVIP’s knowledge of its falsehood. No evidence was introduced that MDVIP believed or should have known that its statistic was a mischarac-terization of the truth.
Although Plaintiff did allege some non-puffery statements which could have grounded the fraud claims, Plaintiff failed to introduce any evidence which would support the necessary conclusion that MDVIP knew its statements were untrue at the time they were made.[6] Because no proper view of the evidence could sustain the verdicts in light of this failure, we reverse the trial court’s denial of MDVIP’s motions for directed verdict on the fraud claims and remand for the trial court to grant MDVIP’s motions.

B. Plaintiff’s motions for directed verdict on apparent agency and joint venture grounds.

This Court reviews motions for directed verdict de novo. Henry, 82 So.3d at 965. “A motion for directed verdict should be granted only when the evidence, viewed in the light most favorable to the non-moving party, shows that a jury could not reasonably differ as to the existence of a material fact and that the movant is entitled to judgment as a matter of law. If there is any evidence to support a possible verdict for the non-moving party, a directed verdict is improper.” Brown v. Kaufman, 792 So.2d 502, 503 (Fla. 4th DCA 2001) (citation omitted).
Plaintiff moved for, and was granted, directed verdicts on claims of apparent agency and joint venture establishing MDVIP’s vicarious liability for damages directly attributable to Dr. Metzger’s negligence. Under the standard just described, the granting of those motions was only proper if there was no evidence that could have allowed a reasonable jury to conclude that any element of those claims was not met. We hold that, for both issues, such evidence was admitted and therefore that the directed verdicts were improper.
First, we consider the issue of apparent agency. Apparent agency has three elements: “(a) a representation by the purported principal; (b) a reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation.” Stone v. Palms W. Hosp., 941 So.2d 514, 519 (Fla. 4th DCA 2006) (quoting Roessler v. Novak, 858 So.2d 1158, 1161 (Fla. 2d DCA 2003)). Reliance on apparent authority “must be *564 reasonable and rest in the actions of or appearances created by the principal.” Id. at 520 (quoting Lensa Corp. v. Poinciana Gardens Ass’n, 765 So.2d 296, 298 (Fla. 4th DCA 2000)).
Here, evidence was introduced that MDVIP mailed a Frequently Asked Questions document to Plaintiff which expressly disclaimed Dr, Metzger being MDVIP’s agent. The document stated, in part, “Your doctor owns the practice, and MDVIP has absolutely no involvement whatsoever in any medical decisions. Our job is simply to remove all obstacles that exist to the delivery of the highest level of care,” On its face, this evidence appears to both invalidate any representation by MDVIP under the first element of apparent agency, and call into question the reasonableness of any reliance on any other representation made.
Plaintiffs attempts to brush aside this disclaimer are unpersuasive. First, although there was no direct evidence that Plaintiff read the document, there was evidence that it was mailed to Plaintiff. Viewing the evidence in the light most favorable to MDVIP, as we must, we hold that the evidence of mailing , was sufficient to create ah inference that the document was read. Second, Plaintiff relies on the “remove all obstacles” sentence from the document, arguing that this case is about the obstacles that’ arose which prevented Plaintiff from receiving adequate care. But MDVIP’s statement in that sentence has nothing to do with its relationship with Dr. Metzger; instead, it is a statement about MDVIP’s responsibilities to Plaintiff; Whether MDVIP lived up to this statement or not is irrelevant to the question of whether MDVIP held out Dr. Metzger as its agent.
We therefore hold that a reasonable jury could have found that at least the first two elements of apparent agency were not met. The document quoted above delineates two separate but related endeavors: Dr. Metz-ger would provide medical care, and MDVIP would .provide support services. The document may have been evidence of a collaboration between Dr. Metzger and MDVIP, but it also disclaims any hierarchical relationship between the two. Because a jury could have found that MDVIP did' not represent itself as Dr. Metzger’s principal or that Plaintiffs reliance on MDVIP’s representations was unreasonable based on this document, we hold that the trial court’s grant of Plaintiffs motion for directed verdict on the issue of apparent agency was error.
The next issue’presented is whether the trial court erred in directing a verdict on the issue of joint venture. Joint venture has five elements, each of which must be established: “1) a community of interest in performance of a common purpose; 2) joint control or right of control; 3) a joint proprietary interest; 4) a right to share in profits; 5) a duty to share in losses.” Arango v. Reyka, 507 So.2d 1211, 1212 (Fla. 4th DCA 1987). Our analysis below focuses solely on the second of these elements.
The “joint control” contemplated by the second element exists when a contract specifically allows both parties to control the operations of the venture. For example, in Chase Manhattan Mortgage Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A., 694 So.2d 827 (Fla. 4th DCA 1997), this Court held that a party that was “free to make mortgage loans to anyone on any terms of its choosing” was’ not in a joint venture with a separate corporation. Id. at 831. This was true’ despite the fact the other éntity had established “lending standards” which the first party was required to meet if it desired to engage in continued business with the second'party. Id.
*565 Here, Plaintiff argues that MDVIP maintained control over its business with Dr. Metzger because MDVIP had the power to revoke the contract if Dr. Metzger failed to comply with certain • standards. But just as in Chase, conditions for a continued relationship “d[o] not constitute control by [MDVIP] over [Dr. Metzger] for purposes of joint venture law.” Id. The evidence presented regarding Dr. Metz-ger’s control over medical decisions and the day-to-day operations of his practice was therefore sufficient to allow a reasonable jury to conclude that there was no joint control. Id.; see also E & H Cruises, Ltd. v. Baker, 88 So.3d 291, 295 (Fla. 3d DCA 2012) (finding no joint venture when one party “ha[d] no control over, nor say in, how the [business’s services] [were] operated”); A & A Elec. Servs., Inc. v. Jurado, 198 So.3d 37, 42-43 (Fla. 2d DCA 2015) (similar); cf. Arango, 507 So.2d at 1213-14 (holding that evidence of joint control existed sufficient to send the issue to the jury where a hospital maintained control over day-to-day’ operations such as patient scheduling and group assignments).
Because a reasonable jury viewing the evidence in the light most favorable to MDVIP could have concluded that MDVIP did not have joint control or right of control over Dr. Metzger’s practice, we hold that the trial court erred in granting a directed verdict in favor of Plaintiff on the issue of joint venture.
The final question we are faced with is whether these errors require reversal under the specific facts of this case; Although the jury never considered apparent agency or joint venture (due to the directed verdict on these issues), its verdict did find that Dr. Metzger was MDVIP’s actual agent. Plaintiff urges us to hold that this finding by the jury renders any error in the directed verdicts harmless because MDVIP would be vicariously liable for Dr. Metzger’s malpractice under any of the three theories. Although we find Plaintiffs argument persuasive, it is not compelling enough to meet the heightened standard of Special v. West Boca Medical Center, 160 So.3d 1251 (Fla. 2014).
“To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict.” Id. at 1256. Plaintiff attempts to meet this burden primarily by relying on the trial court’s instruction to the jury that it “should consider the evidence as it relates to each claim separately.” However, we find this instruction to be insufficient in this case for two reasons.
First, 4he trial court’s instruction only told the jury that it was to consider the evidence for each claim it was considering separately. The issues of apparent agency and joint venture, however, were not being considered by the jury. It is possible that, even presuming the jury followed the court’s instruction, see Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932, 942 (Fla. 2000), the jury was unaware that it should not have allowed the directed verdicts to play a role in their consideration of the issues left before them. Second and relatedly, Plaintiffs counsel’s statement to the jury regarding the directed verdicts may have misled them, especially in light of the ambiguity in the court’s instruction. The counsel’s statement was, in full:
Okay. So the defense has alleged that Dr. Lowen—well, actually, before I get there, believe it or not, the agency question is.just one question. It’s already been determined as a matter of law *566 that—by the Court that Dr. Metzger was an apparent agent and was engaged in a joint venture business enterprise; MDVIP and Dr. Metzger together. So that’s not an issue for you to determine, it’s already been determined by the Court.
It is possible that a lay jury, having been told that the judge has determined that Dr. Metzger was apparently MDVIP’s agent and that the two were engaged in a joint venture, would have believed that the only rational conclusion to reach on the issue of actual agency was in Plaintiffs favor. When this suggestion is combined with the possible interpretation of the court’s instructions that would allow the jury to consider these directed verdicts, we cannot say that there was no reasonable possibility the erroneously granted directed verdicts affected the outcome of this case.
We also find the case law cited by Plaintiff to be distinguishable on this issue. To start, both cases—Conklin Shows, Inc. v. Clementi, 448 So.2d 588 (Fla. 5th DCA 1984), and Slawson v. Fast Food Enterprises, 671 So.2d 255 (Fla. 4th DCA 1996)—were decided before the Special standard was in place. Furthermore, the directed verdict that counsel mentioned to the jury in Conklin Shows was both on a sufficiently unrelated issue (the negligence of a separate individual) and was not erroneous. Conklin Shows, 448 So.2d at 589. Here, in contrast, the directed verdict and eventual jury verdict were on closely related issues and the directed verdict was improper. Slawson is even more inapplicable, in that it dealt with whether the jury was properly instructed on the law and did not involve a directed verdict. Slawson, 671 So.2d at 260. We therefore distinguish both cases from the present one, where the jury was informed of directed verdicts on closely related issues which should not have been granted, and where we must analyze the harmfulness of the directed verdicts under the standard of Special.
Because there is a reasonable possibility that the directed verdicts had a spillover effect on the verdict reached by the jury, we cannot say that the error in granting the directed verdicts was harmless. We therefore reverse the final judgment on the issue of MDVIP’s vicarious liability.
Conclusion
Plaintiff entered into a “Membership Agreement” with MDVIP primarily based on this being her only opportunity to continue having Dr. Metzger as her primary care physician. Dr. Metzger had been Plaintiffs primary care physician for five years before affiliating with MDVIP. It was Plaintiffs experience with Dr, Metz-ger, consistent with MDVIP’s motto of “exceptional doctors, exceptional care, and exceptional results,” that led Plaintiff to join MDVIP, and there is no evidence of MDVIP overlooking any “red flags” with respect to Dr. Metzger. As discussed above, the trial court erred in denying MDVIP’s motions for directed verdict on the two counts of fraud. We reverse this denial and remand for entry of directed verdicts in MDVIP’s favor on those counts.
To the extent that MDVIP has challenged the size of the negligence damages award or the jury’s verdict finding that Dr. Metzger himself was negligent, we affirm. We hold that these issues were sufficiently separated from the erroneous holdings described herein and that the trial was not “contaminated” by the joint consideration of the fraud and negligence claims.
On the other hand, the trial court erred in granting Plaintiffs motions for directed verdict on the issues of apparent agency and joint venture. These errors were not harmless. We thus reverse the grants of these motions and remand for a new trial on all three claims of vicarious liability.

*567
Reversed and remanded for further proceedings consistent with this opinion.

Taylor and Conner, JJ., concur.

. We affirm, without discussion, the trial court’s denial of Appellant MDVIP’s motion *559 for new trial based on allegedly improper closing arguments. Similarly, we find no merit in MDVIP’s argument that the jury was confused by, or the trial contaminated by, the separate issues of the reasonable care owed for the negligence claims and the exceptional care promised for the fraud claims. Moreover, our reversal on the directed verdict issues renders the cross-appeal moot.

. Throughout this opinion, "Plaintiff” may refer both to Joan Beber, the patient, and to Robert Beber, her husband and the personal representative of her estate.

. Because we find each of these statements present in the complaint, we need not address the parties’ arguments related to whether these issues were tried by consent.

. We have considered Plaintiff’s argument that some of the statements of opinion were actually statements of fact based on MDVIP’s superior knowledge. See Thor Bear, 648 So.2d at 172, We reject this argument based on Plaintiff's failure to allege that she relied upon MDVIP's representations because of its superior position, see Mejia v. Jurich, 781 So.2d 1175, 1178 (Fla. 3d DCA 2001), and on the failure to allege that MDVIP itself purported to have superior knowledge, see A.S.J. Drugs, Inc. v. Berkowitz, 459 So.2d 348, 350 (Fla. 4th DCA 1984).

. Representing that a medical concierge program values physician competence/“excellence” is not necessarily a misrepresentation even though the principle criteria for the program’s physician selection is a "book” of patients and patient attachment to the physician. McDonald’s and Subway are among the U.S. restaurants with the most customers and sales, which indicates customer attachment and, at least arguably, that aspects of the dining experience are “excellent,” notwithstanding a dearth of Michelin stars.

. This holding negates any need for us to examine the effects of the integration clause in the agreement' between Plaintiff and MDVIP.