# Third District Court of Appeal
## State of Florida

Opinion filed April 9, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-0605
Lower Tribunal No. 23-12634-CA-01
_____

## Miami Dolphins, Ltd. and South Florida Stadium, LLC,
Appellants,

vs.

## Cameron Engwiller,
Appellee.

An Appeal from a nonfinal order from the Circuit Court for Miami-Dade County, Spencer Eig, Judge.

Kennedys CMK LLP, Jedidiah Vander Klok, Alexander J. Fumagali, and Sneh I. Patel, for appellants.

Michael T. Gelety (Fort Lauderdale), for appellee.

Before LINDSEY, MILLER, and GORDO, JJ.

MILLER, J.

Appellants, Miami Dolphins, Ltd. and South Florida Stadium, LLC, challenge a nonfinal order denying their motion to compel arbitration and stay litigation in a negligent security action brought by appellee, Cameron Engwiller. On appeal, appellants contend the trial court erred in refusing to compel arbitration because there was a valid written agreement to arbitrate, and appellee was bound by the agreement through agency principles. For the reasons that follow, we reverse.

## I

Appellee was injured at the Hard Rock Stadium in late 2022 after a fight broke out among fans at a Miami Dolphins-Pittsburgh Steelers game. Appellee attended the game with her boyfriend and mother, and she gained access to the stadium on the day of the game with electronic tickets her mother accepted from her employer, Southeast Toyota Distributors, LLC.

Appellee's mother created an account through the Dolphins Account Manager in 2019. Five days before the Dolphins-Steelers game, she accepted the tickets from her employer by logging into the Dolphins Account Manager website on her mobile device. Between the user log-in fields and the "Sign In" button, the Dolphins Account Manager website displayed the following notice: "By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in both the

2

Ticketmaster **Privacy Policy** and **Hard Rock Stadium Privacy Policy**."

The bolded phrases were hyperlinked and printed in aqua, a different color

than the rest of the page. The "Terms of Use" hyperlink digitally directed the

user to the "2022-2023 Hard Rock Stadium Ticketback Terms."

The Ticketback Terms explained that the ticket constituted a revocable

license for one-time entry into the stadium for a specified event, subject to

the delineated terms of use. The Ticketback Terms also contained a broad,

mandatory arbitration provision requiring all ticketholders to arbitrate their

disputes in Miami with the alternative dispute resolution firm JAMS.

On the day of the game, appellee's mother displayed the tickets on her

mobile device for a scanning attendant so that she, appellee, and appellee's

boyfriend could enter the stadium. It is undisputed that appellee never

accessed or possessed the tickets.

Appellee was injured and subsequently filed a negligence action

against appellants in the circuit court. Appellants moved to compel

arbitration and stay litigation pending the outcome, contending that

appellee's mother agreed to the mandatory arbitration provision in the

hyperlinked Ticketback Terms when she accessed the tickets using the

Dolphins Account Manager website, and that appellee was bound by her

mother's agreement under agency principles. In furtherance of their motion,

3

appellants filed a sworn declaration from the Dolphins' director of ticket operations, Daniel Brown, along with the Ticketback Terms, screenshots of the sign-in page, and internal records reflecting appellee's mother's online activity.

The trial court denied the motion, finding that appellants "failed to attach the actual binding agreement" or establish an agency relationship between appellee and her mother. This appeal ensued. We have jurisdiction. See Fla. R. App. P. 9.130(a)(3)(I).

## II

## A

On appeal from the denial of a motion to compel arbitration, we apply a hybrid standard of review. The trial court's legal analysis is reviewed de novo, while any factual findings are reviewed for competent, substantial evidence. See Am. Mgmt. Servs., Inc. v. Merced, 186 So. 3d 612, 614 (Fla. 4th DCA 2016).

## B

Florida law favors arbitration, and our courts have routinely held that any doubt regarding the arbitrability of a claim should be resolved in favor of arbitration. See, e.g., Mia. Marlins, L.P. v. Miami-Dade County, 276 So. 3d 936, 938 (Fla. 3d DCA 2019). At the same time, "a party cannot be required

to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).  In determining whether to compel arbitration, the court must consider "(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived."  Seifert v. U.S. Home Corp., 750 So. 2d 633, 636 (Fla. 1999).  This dispute implicates only the first element.

"Because arbitration agreements are contracts, ordinary state law principles of contract formation apply."  Massage Envy Franchising, LLC v. Doe, 339 So. 3d 481, 484 (Fla. 5th DCA 2022); see also § 682.02(1), Fla. Stat. (2022) ("An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract.").  Notice and assent are key to a valid contract.  See Doe, 339 So. 3d at 484–85.  Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct.  However, "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct

that he assents." Restatement (Second) of Contracts § 19 (Am. L. Inst. 1981).

These basic contractual principles apply with equal force to web-based contracts. If a website offers contractual terms to users, and a user engages in conduct that manifests assent to those terms, an enforceable agreement may be formed.

There are generally two types of contracts in electronic transactions—"clickwrap" agreements and "browsewrap" agreements. In MetroPCS Communications, Inc. v. Porter, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018) (quoting Vitacost.com, Inc. v. McCants, 210 So. 3d 761, 762 (Fla. 4th DCA 2017)) (quotation marks omitted), this court distinguished between the two as follows:

> A "clickwrap" agreement occurs when a website directs a purchaser to the terms and conditions of the sale and requires the purchaser to click a box to acknowledge that they have read those terms and conditions. A "browsewrap" agreement occurs when a website merely provides a link to the terms and conditions and does not require the purchaser to click an acknowledgement during the checkout process. The purchaser can complete the transaction without visiting the page containing the terms and conditions.

While "a person has no right to shut his eyes or ears to avoid information[] and then say that he has no notice[,]" Sapp v. Warner, 141 So. 124, 127 (Fla. 1932), the law imposes a heightened burden on a party seeking to enforce

6

agreements that are more akin to browsewrap than clickwrap. Such agreements are enforceable only where "the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." MetroPCS, 273 So. 3d at 1028 (quoting McCants, 210 So. 3d at 763) (quotation marks omitted). This framework avoids the unfairness associated with enforcing contractual terms that consumers never intended to accept.

Here, appellee's mother was not required to click an acknowledgment box prior to accepting the tickets. Hence, there was no clickwrap agreement. But nor is there a pure browsewrap agreement. By logging into her account, appellee's mother signified her assent to the Terms of Use. Like in MetroPCS, this agreement "does not precisely fit within either category, although it is akin to a browsewrap agreement in that [appellee's mother] completed [her] transaction with [the Dolphins] without visiting the web page containing the terms and conditions." Id. Hence, we must consider whether the hyperlink was sufficiently conspicuous.

The Terms of Use hyperlink was displayed on the center of the page between the two log-in fields—username and password—and the sign-in button. The phrase "Terms of Use" was bolded and offset from the rest of

7

the page in a contrasting, brightly colored aqua ink. While we are cognizant that "[c]onsumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks,'" Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 857 (9th Cir. 2022) (quoting Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1179 (9th Cir. 2014)), here, the text was sufficiently conspicuous and offset to place a reasonable user on inquiry notice, see id. ("A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage.") (citation and quotation marks omitted); see also Derriman v. Mizzen & Main LLC, 710 F. Supp. 3d 1129, 1140 (M.D. Fla. 2023) (holding that hyperlinked text which was set off in a different color and "prominently placed" on top of a "GET 15% OFF" button was "conspicuous enough to give [the] [p]laintiff notice"); Kravets v. Anthropologie, Inc., No. 22-CV-60443, 2022 WL 1978712, at *4–5 (S.D. Fla. June 6, 2022) (holding that terms located directly above a "GET FREE SHIPPING NOW" button that contained bold and underlined links to

8

additional terms were conspicuous enough to put a reasonably prudent person on inquiry notice of terms); Bell v. Royal Seas Cruises, Inc., No. 19-CIV-60752-RAR, 2020 WL 5639947, at *6 (S.D. Fla. Sept. 21, 2020) (holding that a hyperlink to terms and conditions that was directly above a "Continue" button was "conspicuous enough to put a reasonably prudent person on inquiry notice of the Terms and Conditions" because "it is nearly impossible that any user would not see that statement before hitting 'Continue[]'" and "a reasonable person would understand that by clicking 'Continue' directly under a sentence that begins 'I understand and agree,' the user is assenting to the statements or conditions that follow") (internal ellipses and brackets omitted). Consequently, we conclude appellee's mother assented to the Ticketback Terms by claiming the tickets.

Appellee's assertions that the tickets are mere "exemplars" or that unspecified changes to the Terms of Use between the time her mother created her original user account and accepted the relevant tickets do not alter this conclusion. Appellants established that the 2022-2023 Hard Rock Stadium Ticketback Terms were in effect when appellee's mother accepted the tickets, and there is simply no authority requiring a party seeking enforcement of an electronic contract to produce a screenshot from the same device used by the other contracting party.

9

## C

We must therefore consider whether appellee was similarly bound.  A non-signatory may be bound to an arbitration agreement through agency principles.  See Paquin v. Campbell, 378 So. 3d 686, 690 (Fla. 5th DCA 2024).  "The existence of an agency relationship may be established expressly, or by estoppel, apparent authority, or ratification."  Chase Manhattan Mortg. Corp. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A., 694 So. 2d 827, 832 (Fla. 4th DCA 1997); see also Paquin, 378 So. 3d at 690 ("Non-signatories may be bound to arbitration agreements under theories of (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego; and (5) estoppel."); Stalley v. Transitional Hosps. Corp. of Tampa, Inc., 44 So. 3d 627, 630 (Fla. 2d DCA 2010) ("An agency relationship can arise by written consent, oral consent, or by implication from the conduct of the parties.").

Actual agency requires "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."  Fla. Power & Light Co. v. McRoberts, 257 So. 3d 1023, 1026 (Fla. 4th DCA 2018) (quoting Goldschmidt v. Holman, 571 So. 2d 422, 424 n.5 (Fla. 1990)).  Apparent

10

agency, also known as implied agency, requires "(1) a representation by the principal that the actor is his or her agent, (2) reliance on that representation by a third party, and (3) a change in position by the third party in reliance on that representation." Stalley, 44 So. 3d at 630 (citing Mobil Oil Corp. v. Bransford, 648 So. 2d 119, 121 (Fla. 1995)).

Turning to the case at hand, we agree that appellee's mother may not have acted with appellee's authorization or control when she initially obtained the tickets. Nonetheless, she did act as appellee's agent once appellee allowed her to present the ticket on her behalf to enter the stadium and attend the game. See Kumar Corp. v. Nopal Lines, Ltd., 462 So. 2d 1178, 1185 (Fla. 3d DCA 1985) ("It is a fundamental proposition of the law of agency that a principal may subsequently ratify its agent's act, even if originally unauthorized, and such ratification relates back and supplies the original authority."); ABC Salvage, Inc. v. Bank of Am., N.A., 305 So. 3d 725, 729 (Fla. 3d DCA 2020) ("[R]atification of an agreement occurs where a person expressly or impliedly adopts an act or contract entered into in his or her behalf by another without authority.") (quoting Deutsche Credit Corp. v. Peninger, 603 So. 2d 57, 58 (Fla. 5th DCA 1992)); see also Jackson v. World Wrestling Ent., Inc., 95 F.4th 390, 393 (5th Cir. 2024) (holding that, under

11

Texas law,[1] the plaintiff's cousin acted as the plaintiff's agent even though the cousin purchased the ticket to the wrestling match as a gift and thus without the plaintiff's knowledge because the plaintiff "allowed [the cousin] to present the ticket on his behalf for admittance to the stadium").

Further, all entrants were required to agree to the conditions of the single-use license as set forth in the Ticketback Terms. Appellants altered their position in reliance on this representation, as they would not have admitted appellee into the stadium absent agreement to the Ticketback Terms. We therefore conclude appellee was bound to arbitrate by principles of agency.

**D**

In closing, we note that arbitration agreements are designed to promote efficient dispute resolution. See Turner Constr. Co. v. Advanced Roofing, Inc., 904 So. 2d 466, 470 n.2 (Fla. 3d DCA 2005) (quoting Bill Heard Chevrolet v. Wilson, 877 So. 2d 15, 18 (Fla. 5th DCA 2004)). Allowing a guest patron to accept the benefits of an entrance ticket without regard to corresponding conditions would undermine this important public policy

---

[1] Like Florida law, Texas law provides that "a non-signatory to an arbitration agreement" can be bound thereby "through the application of traditional agency principles." Compare Jackson, 95 F.4th at 393 with Paquin, 378 So. 3d at 690.

12

consideration and create an unworkable precedent, potentially disrupting any industry reliant on uniform ticket terms.  See Naimoli v. Pro-Football, Inc., 120 F.4th 380, 388 (4th Cir. 2024) ("Such apparent authority is reflected not only in the circumstances of this case, but it reflects the reasonable practice of virtually every ticketed event where one person buys tickets for himself or herself as well as for family and friends, often to sit together."); Jackson, 95 F.4th at 393 ("Although Mott was not acting subject to Jackson's authorization or control when he purchased the tickets as a surprise gift, he did act as Jackson's agent when Jackson allowed him to present the ticket on his behalf for admittance to the stadium. . . .  Event attendees routinely purchase and present tickets on behalf of family and friends, and in doing so, accept the required terms and conditions.") (citations omitted); cf. Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 594 (1991) ("Finally, it stands to reason that passengers who purchase tickets containing a forum clause like that at issue in this case benefit in the form of reduced fares reflecting the savings that the cruise line enjoys by limiting the fora in which it may be sued.").  Accordingly, we reverse the order under review and remand with instructions to compel arbitration and stay the case pending the outcome.

Reversed and remanded.

13